**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LINCOLN BENEFIT LIFE COMPANY, | |
| Plaintiff, | No. 2:15-cv-06703-TJS |
| v. | |
| VALENTIN RADU, | |
| Defendant. | |

## LINCOLN BENEFIT LIFE COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Jason P. Gosselin
Katherine L. Villanueva
Daniel B. Rotko
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA  19103-6996
(215) 988-2700

*Counsel for Plaintiff Lincoln Benefit Life Company*

Pursuant to Federal Rule of Civil Procedure 56 and the corresponding Local Rules, Plaintiff Lincoln Benefit Life Company ("Lincoln Benefit"), by and through its undersigned counsel, hereby submits this Memorandum in Support of Its Motion for Summary Judgment.

## I.    <u>INTRODUCTION</u>

Paul J. Godlewski knowingly failed to disclose material facts to Lincoln Benefit in his reinstatement application for life insurance. The misrepresentations included multiple overnight hospitalizations as a result of substance abuse, years of psychiatric treatment, and a multitude of prescription medications for depression, insomnia, anxiety, and stress. None of this information was disclosed on the reinstatement application for the subject policy, and the policy is therefore void.

In July 2013, Lincoln Benefit reinstated a $250,000 life insurance policy on the life of Godlewski in reliance on Godlewski's express representations to Lincoln Benefit concerning his medical conditions on the application. Unbeknownst to Lincoln Benefit at the time, Godlewski failed to disclose his history of hospitalizations, previous overdoses, and extensive psychiatric treatment. Less than two years after the policy was reinstated, Godlewski passed away. Lincoln Benefit then discovered that the representations on which Lincoln Benefit had reasonably relied—specifically those regarding the foregoing conditions —were patently false when made.

The ability to measure risk is the touchstone of an insurance contract. In order to measure and price the risk that it is taking on, a life insurer must—and is legally entitled to—rely on the insured's representations regarding his or her health. Insurers, such as Lincoln Benefit, are entitled to full, complete and accurate answers in the application so they can properly evaluate the risk associated with issuing the applied-for policy. If the prospective insured provides false information that is material to the insurer's decision to issue a policy and/or reinstate the policy, the policy is void.

In this case, documentary evidence, including certified medical records, and deposition testimony confirm that Godlewski misrepresented his medical history. Because Godlewski's medical history and treatment was substantial, and proximate in time (even ongoing) when he completed his reinstatement application, the Court may determine that he knowingly misrepresented this information on the reinstatement application. Finally, as other cases have recognized and as confirmed by Lincoln Benefit's Chief Underwriter, these misrepresentations were material to Lincoln Benefit's decision to issue the policy. The policy is therefore void, and Lincoln Benefit is entitled to summary judgment.[1]

---

[1] The instant motion seeks summary judgment on Count I, in which Lincoln Benefit asserts that the policy is void due to material misrepresentations. Based on the progression of the case and evidence obtained in discovery, Lincoln Benefit does not seek summary judgment on its claim concerning the cause and manner of Godlewski's death (Count III), but resolution of the instant motion will render moot Count III. Further, upon consent of the defendants in each action,

## II. FACTUAL BACKGROUND

Lincoln Benefit incorporates herein by reference its Statement of Undisputed Material Facts.  In the interest of brevity, the factual assertions made in this Memorandum of Law are supported by citations to Lincoln Benefit's Statement of Undisputed Material Facts (hereinafter, "SUF"), which citations Lincoln Benefit intends to also refer to the evidence cited therein.

## III. LEGAL STANDARD

Summary judgment is proper when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party establishes the absence of any genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  The non-moving party may not merely rest on the pleadings, but must affirmatively establish through admissible evidence that a triable material fact remains.  *Celotex Corp.*, 477 U.S. at 324.

---

Lincoln Benefit intends to voluntarily dismiss Count II, which sought declaratory relief concerning the proof of death submitted to Lincoln Benefit.  By way of background, Lincoln Benefit originally asserted Count II based on the incomplete and unreliable information provided to Lincoln Benefit at the time of claim.  Discovery (including but not limited to supplemental information from the medical examiner in response to a subpoena) has resolved the question of Godlewski's death.  Lincoln Benefit has since paid the proceeds in connection with the policies that it does not contest for material misrepresentations.  (Those policies are beyond the two-year contestability period.)

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Burkert v. Equitable Life Assur. Soc'y of the U.S.*, No. 99-1, 2001 U.S. Dist. LEXIS 2995, at *9 (E.D. Pa. Mar. 20, 2001) *aff'd, by Burkert v. Equitable Life Assur. Soc'y of Am.*, 287 F.3d 293 (3d Cir. 2002) (citations omitted). Thus, "if the evidence [the non-moving party offers] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Mere scintillas of evidence do not satisfy this burden. *Id.* at 252.

In cases seeking to void life insurance policies, an insurer has the burden of proving by clear and convincing evidence the following three factors: (1) the insured made a false representation; (2) the insured knew[2] the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured. *Nw. Mut. Life Co. v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005) (citations omitted).

All three factors may be decided on summary judgment. *Burkert*, 287 F.3d at 297-99 (granting summary judgment for insurer, in part, because the insured's answers to questions regarding drug and alcohol abuse and prescription drugs

---

[2] In cases involving alleged misrepresentations on life insurance applications, a court may find that an insured made a material misrepresentation as a matter of law even when, as here, the insured certified that the responses in the subject application were true to the best of his or her "knowledge and belief." *Burkert* , 287 F.3d at 297 (granting summary judgment for insurer even though insured represented on the application that his answers were "true and complete to the best of [his] knowledge.")

"were patently false;" there was "no question that [the insured] knew his answers were false;" and the misrepresentations were "material to the risk assumed."); *see also Babayan*, 430 F.3d at 132 (reaffirming the *Burkert* court's reasoning and holding "summary judgment may be entered when, based upon the evidence produced in discovery, the only reasonable inference a fact finder could draw is that the applicant's answers were knowingly false, or made in bad faith.").

## IV.   <u>ARGUMENT</u>

Under Pennsylvania law, a life insurance policy is void *ab initio* where an insured's concealment or misrepresentation of information was material to an insurer, regardless of whether the misrepresentation was related to the cause of death.  *See Burkert v. Equitable Life Assur. Soc'y of Am.*, 287 F.3d 293, 297 (3d Cir. 2002).  Consistent with Pennsylvania law, the Policy here provides that Lincoln Benefit may contest the Policy based on false statements in the application for reinstatement within two years of the date of reinstatement.  *See* SUF ¶14. Because Godlewski concealed and misrepresented material information on his application for reinstatement, the Policy is void.  Further, medical records and other documentary evidence confirm that Godlewski was aware of his true medical condition, resolving any perceived factual question associated with his certification on the reinstatement application that the answers were true to the best of his knowledge and belief.

## A.    Legal Framework.

Under Pennsylvania law, the Policy will be deemed void if Lincoln Benefit can establish the following three elements: (1) that Godlewski's representations were false; (2) that Godlewski knew the representations were false when made or made them in bad faith; and (3) that the representations were material to the risk being insured.  *N.Y. Life Ins. Co. v. Johnson*, 923 F.2d 279, 281 (3d Cir. 1991).

The factfinder typically decides whether the insured knew that the subject representations were false "because evaluating [the insured's] state of mind often requires the drawing of inferences from the conduct of parties about which reasonable people might differ."  *Justofin v. Metro. Life Inc.*, 372 F.3d 517, 524 (3d Cir. 2004), (quoting *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985)).  However, a court may determine an insured's state of mind for purposes of summary judgment where the circumstances demonstrate that the insured was aware of the misrepresentations and/or omissions, or that an inference of fraud is otherwise irresistible.  *Provident Life & Accident Co. v. Charles*, 1993 U.S. Dist. LEXIS 5030, at *18 (E.D. Pa. Apr. 14, 1993) aff'd without opinion, 14 F.3d 48 (3d Cir. 1993) (quoting *Evans v. Penn Mutual Life Ins. Co.*, 322 Pa. 547, 186 A. 133, 138 (Pa. 1937)).  Such an inference is appropriate, for example, when an unreported medical condition was so serious or so recent that the insured could not reasonably have forgotten it.  *Id.*

In *Grimes v. Prudential Ins. Co. of Am.*, 585 A.2d 29, 31-32, (Pa. Super. Ct. 1991), the court explained that "[w]here it is established by uncontradicted documentary evidence that the insured has consulted physicians so frequently, or undergone medical or surgical treatment so recently, or of such a serious nature, that a person of ordinary intelligence could not have forgotten these incidents in answering a directed and pointed question in an application for insurance, bad faith may be inferred as a matter of law if the insured denies in his answer that any physical has been consulted, or any medical or surgical treatment has been received during the period of inquiry." (citation omitted). *See also Am. Franklin Life Inc. Co. v. Galati*, 776 F. Supp. 1054, 1061 (E.D. Pa. 1991) (insured could not have innocently overlooked or forgotten extensive medical treatment related to two traffic accidents which occurred within five years prior to application); *Monarch Life Ins. Co. v. Donahue*, 708 F. Supp. 674, 676 (E.D. Pa. 1989) (inconceivable that insured was unaware that he suffered from a nervous condition given that he had four seizures and Dilantin treatment within five years prior to application).

Other jurisdictions have similarly recognized that a determination concerning an insured's knowing misrepresentations may be made as a matter of law. *See, e.g., Davis v. Integon Life Ins. Corp.*, 645 F.2d 494, 498 (5th Cir. 1981) ("it is inconceivable that a person acting in good faith, even if illiterate, could have failed to disclose a hospitalization occurring only three months before the

interrogation in response to th[e subject] question") (internal quotation marks omitted); *Mims v. Old Line Life Ins. Co. of Am.,* 46 F. Supp. 2d 1251, 1257 (M.D. Fla. 1999) ("a diagnosis of illness is not automatic proof of an insured's knowledge of such illness, [but] no logical leap is required to assume that if, as the record shows, [the insured] sought medical care, she knew she was seeing a doctor and knew her answers to the contrary were false.").

### B. Godlewski Made Knowing, Material Misrepresentations to Lincoln Benefit.

Godlewski knowingly made a series of material misrepresentations on his reinstatement application for the Policy.[3] The misrepresentations relate to Godlewski's hospitalizations, substance abuse issues, psychiatric disorders, and prescription medications. Godlewski knowingly concealed this information from Lincoln Benefit; there is no question that the severity and significance of Godlewski's undisclosed medical conditions were not "forgotten" or otherwise inadvertently omitted from the application. Finally, as confirmed by Lincoln Benefit's Chief Underwriter, these misrepresentations were material.

---

[3] In addition to the material misrepresentations described herein, Godlewski provided false information concerning his intent to engage in foreign travel. *See* SUF ¶¶7 (denying intent of foreign travel), 240-248 (instances of foreign travel). Furthermore, it is Lincoln Benefit's position that additional material misrepresentations, such as Godlewski's SCUBA diving experience, were contained on the application, *see* SUF ¶7 (denying SCUBA diving), but Lincoln Benefit has not received sufficient information to establish these misrepresentations as material as a matter of law.

1. <u>Godlewski misrepresented his history of hospitalizations and substance abuse.</u>

The reinstatement application specifically asked: "Other than previously disclosed, in the past 5 years, has any Proposed Insureds: . . . had a checkup, consultation, hospitalization, illness, surgery or medical or diagnostic test?" *See* SUF ¶7. Godlewski answered "yes" to this question but disclosed only a check-up with his primary care physician and "[n]ormal results." *Id.*[4] The reinstatement application also asked whether, in the ten years prior, Godlewski had "been diagnosed with, or sought or received treatment or advice for: . . . dependency on or addiction to alcohol or any drug[.]" *Id.* Godlewski answered "no" to this question. *Id.*

Contrary to Godlewski's representations, Godlewski was hospitalized twice in 2012 and 2013, and one admission was within approximately *two months* of the date on which Godlewski signed the reinstatement application. *See* SUF ¶¶22-43. Each hospitalization was precipitated by an overdose and/or overconsumption of alcohol and prescription medication. *See, e.g.,* SUF ¶36 ("EMS states patient

---

[4] Godlewski otherwise disclosed only the following medical conditions and/or treatment on the application for reinstatement: (1) gout and related foot/ankle issues; (2) sialadentis (infection of salivary glands); (3) sleep apnea; (4) blood work; (5) a colonoscopy; and (6) an elbow injury. *See* SUF ¶13. None of the records obtained and reviewed by Lincoln Benefit disclosed the medical history and treatment that Godlewski concealed from Lincoln Benefit on the application. Likewise, Godlewski did not disclose the names of the hospitals to which he had been admitted, any of the treating physicians at those hospitals, or the psychiatrists who treated him for mental disorders, *see infra*.

overdosed on his medication"). Each hospitalization resulted in a multi-night stay. *See, e.g.*, SUF ¶42 (four-night stay at hospital in 2012).

First, on or around June 9, 2012, Godlewski was hospitalized at the Robert Wood Johnson University Hospital in Somerset, New Jersey because he "fell down alongside his bathtub" and hit his head after he mixed "vodka with orange juice" with "lorazepam and Ambien."[5] *See* SUF ¶33. Godlewski's treating physicians at the hospital noted that "[h]e stated that he returned from New York City after a work related breakfast with a client and was feeling quite stressed out after a busy week and was trying to relax and get some rest. . . . He has some amnesia regarding the full events that happened around that time . . . [b]ut recalls preparing some vodka with orange juice and taking some pills." *See* SUF ¶34. Godlewski's "Primary Diagnosis" at the hospital was classified as a "Polysubstance overdose."

---

[5] The police described the incident as follows:

> Paul [Godlewski] was incoherent and had several minor injuries. He was unable to walk without assistance and subsequently was taken to Somerset Medical Center for his injuries. In the master bed there were numerous prescription bottles and small amounts of blood. There was a bottle of [v]odka next to the bed 3/4 empty. In the master bath there was a large amount of blood smeared on the floor, walls and counter. There were approximately 40 mixed pills of different shapes and colors on the floor of the master bath along with broken glass and what appeared to be vomit. There was an unloaded GLOCK 17 (sn # SR741) on the dresser in the master bedroom unloaded. During my investigation I spoke to Gail Coutu who also lives in the house. She stated Paul received bad news a few weeks ago and has been drinking ever since. She stated he has been acting abnormally and believes him to be depressed.

*See* SUF ¶31.

*See* SUF ¶39. Consistent with the Primary Diagnosis, the records state that Godlewski had "[a]rrive[d] with EMS drowsy and slow to respond. EMS states patient overdosed on his medication. Patient states he took 4 each of his medication."[6] *See* SUF ¶41.

On June 13, 2012, after a four-night stay, Godlewski was discharged from the hospital. *See* SUF ¶42. Godlewski's then fiancé, Adriana Calaf, testified at her deposition that Godlewski's hospitalization at the Robert Wood Johnson University Hospital (Somerset) was "significant." *See* SUF ¶43.

Less than one year later, on April 3, 2013, Godlewski was again hospitalized, this time at the Robert Wood Johnson University Hospital after he injured himself from a fall after drinking an "unknown amount" of alcohol with several prescription medications. *See* SUF ¶22. On the night of his admission, Dr. Anjani P. Naidu, a treating physician, noted under "Additional hx: family reports that he missed lunch appointment toady [sic]. They found a half a bottle of vodka. Per patient, he was feeling very anxious. He initially stated he took 1 mg of [A]tivan. He then stated he took two. Unknown amount of Ativan was consumed." *See* SUF ¶23.

---

[6] As discussed *infra*, Godlewski's admission of taking four each of his medication is an example of Godlewski's *knowing* omissions and misrepresentations concerning prescription medication. *See* SUF ¶41.

Dr. Anjani P. Naidu noted: "I agree with the resident's medical decision making and diagnosis of ams [altered mental status], benzo overdose . . . ." *See* SUF ¶24. Clinical observations included in the April 4, 2013 record further stated, "Patient stated drinking day of admission: while in hot tube [sic] he passed out and hit his head. Now patient is complaining of forehead pain. Patient took Dramamine, Lorazepam[,] and he had a couple of beers." *See* SUF ¶26. On April 5, 2013, after a two-night stay, Godlewski was discharged from Robert Wood Johnson University Hospital. *See* SUF ¶27.

Godlewski's representation in June 2013 on the reinstatement application that he had not had a checkup, consultation, hospitalization, illness, surgery or medical or diagnostic test (other than a check-up with normal results) was false when made. Question 4(a) clearly asks about previous hospitalizations in the five years leading up to the date of the applications. *See* SUF ¶7. Medical records confirm that Godlewski was hospitalized *twice* – for multiple nights each – in the year prior to the date of the application. *See* SUF ¶¶22-43. These records demonstrate that Godlewski's response was false when made. Godlewski also failed to disclose his history of substance abuse, which prompted both hospital visits. *See, e.g.*, SUF ¶39 (primary diagnosis of "Polysubstance overdose"). In fact, both hospitalizations were precipitated by a combination of overconsumption

of alcohol and prescription drugs. *Id*. These precipitating events are well documented in medical records and the accompanying police reports.

Godlewski's representations were also material. As Lincoln Benefit's Chief Underwriter testified, Godlewski's hospitalization records confirm that Godlewski "ha[d] both alcohol and prescription drug abuse that . . . ended up in an emergency situation." *See* Villanueva Decl., Ex. V (excerpts of deposition transcript of V. Munchez van der Wagt) at 55:10-12. Ms. Munchez van der Wagt further testified that, had Godlewski disclosed his previous hospitalizations, Lincoln Benefit would have been concerned with, *inter alia*, him "us[ing] alcohol and . . . prescription medication to self-treat self." *Id*. at 54:5-8. According to Ms. Munchez van der Wagt, these issues fit "an abusive profile." *Id*. at 54:9. For these reasons, Lincoln Benefit would have declined to reinstate the Policy had Godlewski disclosed his previous hospitalizations on the application for reinstatement. *Id*. at 55:18-20.

Finally, the Court may determine as a matter of law that Godlewski knowingly misrepresented this information to Lincoln Benefit. Godlewski's representations on the reinstatement application so clearly contradict his significant and habitual history of hospitalizations and the precipitating events for the hospitalizations. After all, Godlewski admitted to his treating physicians that he had consumed alcohol and prescription drugs – contrary to the prescribed amounts – prior to being hospitalized. *See, e.g.*, SUF ¶41 (Godlewski stating he took four

each of his medication).  Yet he failed to disclose this significant history to Lincoln Benefit.  *See* SUF ¶7.  For these reasons, this Court may determine, as in *Burkert*, 287 F.3d at 297-99, and similar cases, that Godlewski made material misrepresentations concerning his previous hospitalizations as a matter of law.[7]

### 2. Godlewski misrepresented his psychiatric treatment.

In addition to misrepresenting his previous hospitalizations and incidents of substance abuse, Godlewski failed to disclose his extensive history of psychiatric treatment.  The reinstatement application asked whether, in the ten years prior, Godlewski had been "diagnosed with, or sought or received treatment or advice for: . . . epilepsy or seizures, disorder of the brain or nervous system, depression, or other mental or nervous disorder[.]"  *See* SUF ¶7.  Godlewski answered "no" to this question.  *Id*.  The reinstatement application also asked if Godlewski was "taking any prescription medications not previously disclosed[.]"  *Id*.  Godlewski also answered "no" to this question.  *Id*.

### a. Godlewski's mental disorders.

Contrary to his representations, Godlewski had a history of depression and mental and nervous disorders.  To treat those conditions, Godlewski consulted two psychiatrists, was prescribed, and took the following prescription medications: Lorazepam (Ativan), Ambien, Clonazepam (Klonopin), Viagara, Desipramine, and

---

[7] Godlewski himself was an insurance producer and thus indisputably had knowledge of the importance of providing truthful information to Lincoln Benefit.  *See* SUF ¶1 (Godlewski identified as writing agent).

Lexapro (escitalopram).  *See* SUF ¶¶45-239.  Medical and pharmacy records confirm that he was taking these six medications – none of which was disclosed on the reinstatement application.  *See* SUF ¶¶193-239.  This includes, but is not limited to, Godlewski's repeated admissions to treating physicians that he was taking prescription medications.  *See, e.g.,* SUF ¶36.

Beginning on or around April 19, 2013, and continuing through September 17, 2013, Godlewski sought treatment from a psychiatrist, Dr. Les Linet.  *See* SUF ¶45.  In total, Godlewski sought treatment from Dr. Linet on seven occasions.  *See* SUF ¶46.  Godlewski specifically sought treatment from Dr. Linet for recurring "spontaneous panic attacks that were quite severe."  *See* SUF ¶47.  On or around April 19, 2013, Godlewski's first consultation, Dr. Linet noted that Godlewski's chief complaint was, "anxiety, initial and late insomnia."  *See* SUF ¶48.  Dr. Linet thereafter diagnosed Godlewski as suffering from a panic disorder.  *See* SUF ¶50.  Dr. Linet also noted under "Mood and affect," "anxiety.  Affect full[.]"  *Id*.  Dr. Linet prescribed Godlewski 1 mg of Clonazepam to be administered twice daily.  *See* SUF ¶51.

Less than one week later, on April 22, 2013, Godlewski again consulted Dr. Linet for psychiatric treatment to monitor the effect of the prescribed Clonazepam.  *See* SUF ¶57.  Because the panic attacks were still occurring, Godlewski's

Clonazepam dosage was increased from a 1 mg tablet twice a day to two-and-a-half 1 mg tablets twice a day. *See* SUF ¶58.

The following month, on May 28, 2013, Godlewski again consulted Dr. Linet for psychiatric treatment. *See* SUF ¶59. At that time, Dr. Linet altered Godlewski's medication, and in addition to Clonzepam, he prescribed Desipramine, an anti-depressant. *See* SUF ¶62. Dr. Linet directed Godlewski to take 10 mg tablet per day of Desipramine and increase up to 50 mg daily, as needed. *See* SUF ¶63. Dr. Linet directed Godlewski to take one 2 mg tablet of Clonazepam twice a day. *See* SUF ¶64.

Unbeknownst to Dr. Linet at the time, Godlewski also regularly sought psychiatric treatment from Dr. Michael Dorfman. *See* SUF ¶78. Dr. Dorfman's treatment of Godlewski began in February 2011, and continued through May 2015.[8] *Id.* In total, Godlewski consulted Dr. Dorfman for psychiatric treatment on thirty-four occasions. *See* SUF ¶79. Dr. Dorfman was likewise unaware that Godlewski was seeking treatment from Dr. Linet. *See* SUF ¶149. Dr. Dorfman testified that such duplicative treatment would be of concern. *See* SUF ¶¶150-152.

Godlewski initially sought treatment from Dr. Dorfman for insomnia. *See* SUF ¶80. Upon Dr. Dorfman's initial evaluation of Godlewski, Dr. Dorfman

---

[8] In the interest of brevity, the following discussion highlights the consultations that contain the most relevant information in the corresponding medical records.

created a "pharmacologic"[9] treatment plan. *See* SUF ¶81. On or around February 22, 2011, Dr. Dorfman prescribed thirty .5 mg tablets of Ativan[10] to be administered a maximum of twice daily at bedtime. *See* SUF ¶82. Dr. Dorfman also prescribed fifteen 10 mg tablets of Ambien to take either a half or whole at night. *See* SUF ¶83.

On April 4, 2011, Godlewski again sought psychiatric treatment from Dr. Dorfman because Godlewski was suffering from "increased anxiety because of family matters" and "family dysfunction." *See* SUF ¶87. Dr. Dorfman thus increased Godlewski's prescription for Ativan and prescribed ninety .5 mg to be administered a maximum of three daily. *See* SUF ¶88. From May 2, 2011 through September 13, 2011, Godlewski sought psychiatric treatment from Dr. Dorfman on four occasions. *See* SUF ¶89.

On November 22, 2011, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶91. Dr. Dorfman noted that Godlewski complained of his "disturbing family," and that Godlewski was taking "more Lorazepam." *See* SUF ¶92. Dr. Dorfman also noted that Godlewski was "anxious." *See* SUF ¶93. Dr. Dorfman increased Godlewski's Lorazepam prescription to one-hundred twenty .5 mg tablets and the Ambien prescription remained unchanged. *See* SUF ¶95.

---

[9] "Pharmacologic" means that only medications were prescribed. *See* SUF ¶81.

[10] Ativan is used as an antianxiety aid. *See* SUF ¶82.

From January 16, 2012, through April 30, 2012, Godlewski sought psychiatric treatment from Dr. Dorfman on three occasions. *See* SUF ¶96. On June 19, 2012, Godlewski again sought psychiatric treatment from Dr. Dorfman and told Dr. Dorfman that he fell and was hospitalized in Somerset, New Jersey. *See* SUF ¶99.

On July 9, 2012, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶101. The July 9, 2012 treatment was approximately three weeks after his prior visit and sooner than the contemplated two months. *See* SUF ¶102. Godlewski returned early because of reported "stress." *See* SUF ¶103. Godlewski's mood and affect were "somewhat anxious." *See* SUF ¶104.

On August 6, 2012, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶107. At that visit, Godlewski explained that he was involved in a business deal that caused "increased anxiety." *See* SUF ¶108. Godlewski had taken "approximately seven of the Ativan .5 milligram tablets in 30 hours." *See* SUF ¶109. Dr. Dorfman increased Godlewski's dosage of Ativan from a maximum of 2 mg a day to 4 mg a day. *See* SUF ¶111.

On September 11, 2012, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶113. Dr. Dorfman changed Godlewski's medication and prescribed 1 mg tablets of Lorazepam to be taken up to four times a day instead of .5 mg tablets of Ativan to be taken up to eight times a day. *See* SUF ¶117.

On October 9, 2012, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶119. At the October 9, 2012 visit, Godlewski's mood and affect were "anxious" and Godlewski "appeared visibly anxious." *See* SUF ¶120. Dr. Dorfman's impression was "chronic anxiety." *See* SUF ¶121. Dr. Dorfman observed Godlewski's "anxiety [as] a significant problem." *See* SUF ¶121.

On November 21, 2012, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶123. As with his previous visits, at the November 21, 2012 visit, Godlewski's mood and affect were "somewhat anxious." *See* SUF ¶125.

On January 10, 2013, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶127. Godlewski himself complained to Dr. Dorfman that "sometimes [Godlewski's] anxiety is high." *See* SUF ¶128. Dr. Dorfman's impression of Godlewski was, "[i]ntermittent anxiety, sometimes BNZ or benzodiazepine requirement increased." *See* SUF ¶129.

On March 26, 2013, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶131. At the March 26, 2013 visit, Godlewski's "stress level [was] up" likely due to business or family stress. *See* SUF ¶132. Godlewski's mood was "anxious," and Dr. Dorfman's impression was that Godewski "tends to run a higher degree of anxiety." *See* SUF ¶133. Dr. Dorfman recommended that Godlewski return for further psychiatric treatment in three months. *See* SUF ¶136.

On April 15, 2013, Godlewski returned much earlier than contemplated to seek further psychiatric treatment from Dr. Dorfman. *See* SUF ¶137. Godlewski complained that his "anxiety fluctuates." *See* SUF ¶138. Dr. Dorfman's impression of Godlewski was that he "need[ed] higher amount of BNZ or benzodiazepine." *See* SUF ¶139. Dr. Dorfman increased Godlewski's Ativan prescription and the Ambien prescription remained the same. *See* SUF ¶140.

On May 21, 2013, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶141. Dr. Dorfman prescribed thirty 1 mg tablets of Klonopin to be administered up to two times a day as needed for anxiety. *See* SUF ¶144.

On June 6, 2013, Godlewski again sought psychiatric treatment from Dr. Dorfman. *See* SUF ¶146. Dr. Dorfman increased Godlewski's Klonopin dosage from thirty 1 mg tablets to sixty 1 mg tablets. *See* SUF ¶147. As of June 6, 2013, Godlewski was also seeking treatment from Dr. Linet. *See* SUF ¶148.

### b. Godlewski's extensive prescription medication.

Beginning in January 2012 (approximately a year and a half prior to the date of the reinstatement application), Godlewski filled prescriptions thirty-one (31) times.[11] *See* SUF ¶¶193-210. None of these prescriptions was disclosed to Lincoln

---

[11] Notably, two of these prescriptions were filled *only days before* Godlewski signed the application for reinstatement representing that he did not take any prescription medications. *See* SUF ¶¶7, 209.

Benefit.[12]  *See* SUF ¶7.  These prescriptions were for the following medication: (1) 12 prescriptions for Lorazepam (Ativan); (2) 12 prescriptions for Zolpidem Tartrate (Ambien); (3) 4 prescriptions for Clonazepam (Klonopin); (4) 2 prescriptions for Escitalopram (Lexipro); and (5) 1 prescriptions for Desipramine. *See* SUF ¶¶193-210.

Godlewski's representations in June 2013 (when he submitted a reinstatement application for the Policy) that, other than a check-up with "[n]ormal results," he had not had sought or received treatment or advice for epilepsy or seizures, disorder of the brain or nervous system, depression, or other mental or nervous disorder; had a checkup, consultation, hospitalization, illness, surgery or medical or diagnostic test; and that he was not taking any prescription medications not previously disclosed, were false when made.  *See* SUF ¶7.

Question 3(b) of the reinstatement application clearly asked about treatment and advice related to depression, mental disorders, and nervous disorders, all of which Godlewski was experiencing at the time he completed the reinstatement application.  Among other things, Dr. Linet and Dr. Dorfman specifically noted that Godlewski experienced "significant problem[s]" of "chronic anxiety," stress, and panic attacks.  *See, e.g.,* SUF ¶¶121 (Godlewski's "chronic anxiety" described

---

[12] Godlewski did not seek prescription medical coverage in connection with these prescriptions. Lincoln Benefit believes that this was an additional step taken by Godlewski to conceal his true medical history.

as "significant problem"), 128 (noting "anxiety is high").  Thus, contrary to Godlewski's failure to disclose such treatment, Godlewski consulted psychiatrists on at least 25 occasions for (1) insomnia; (2) anxiety; (3) depression; and (4) stress.

Question 5 of the reinstatement application asked whether Godlewski was taking "any prescription medications not previously disclosed."  *See* SUF ¶7. Godlewski answered "no" to this question, failing to disclose the thirty-one instances of him filling prescription medications (Lorazepam, Ambien, Ativan, Klonopin, Viagara, Clonazepam, Desipramine, and Lexapro).  *Id.*  Godlewski's denial of taking prescription medication was therefore false when made.

Godlewski's failure to disclose this psychiatric treatment was also material. A prospective insured's psychiatric treatment is important and relevant in the underwriting process.  As Lincoln Benefit's Chief Underwriter testified, Lincoln Benefit's evaluation of a prospective insured and its decision whether to issue a policy depends on the severity of the anxiety and/or the extent to which the prospective insured was taking medication.  *See* Villanueva Decl., Ex. V (excerpts of deposition transcript of V. Munchez van der Wagt) at 68:7-13.  Based on Godlewski's medical records, Godlewski suffered from depression and multiple mental and nervous disorders.  By way example, his anxiety level was "high" and he had unresolved issues with stress and insomnia, leading his treating psychiatrists to continually adjust his prescriptions.  *See, e.g.*, SUF ¶¶128 (noting

"anxiety is high"), 117 (increasing dose of Lorazepam).  Coupled with the substance abuse issues discussed above, these mental and nervous disorders would have rendered Godlewski "uninsurable" by Lincoln Benefit.  *See* Villanueva Decl., Ex. V (excerpts of deposition transcript of V. Munchez van der Wagt) at 68:20.

Finally, the Court may determine as a matter of law that Godlewski knowingly misrepresented this information to Lincoln Benefit.  Godlewski's representations on the reinstatement application so clearly contradict his significant history – 25 visits to psychiatrists and years of monthly prescriptions.  By way of example only, Godlewski could not have forgotten his repertoire of medication after filling prescriptions *thirt-one* in the year and a half leading up to the application for reinstatement.  Yet he failed to disclose this significant history to Lincoln Benefit.  For these reasons, this Court may determine as a matter of law that Godlewski made material misrepresentations concerning his psychiatric treatment and prescription medication.

## V.    <u>CONCLUSION</u>

For all of the reasons set forth above, Lincoln Benefit respectfully requests that the Court enter summary judgment in its favor.  The Policy is therefore void.

/s/ Katherine L. Villanueva
Jason P. Gosselin
Katherine L. Villanueva
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000

Philadelphia, PA  19103
Telephone:  (215) 988-2700
Facsimile:  (215) 988-2757

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2016, a copy of the foregoing was sent via e-mail to:

> John E.D. Larkin
> Gawthrop Greenwood PC
> 17 E. Gay St., Ste. 100
> West Chester, PA 19380
> jlarkin@gawthrop.com

/s/ Katherine L. Villanueva
Katherine L. Villanueva