# EXHIBIT V

**1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4  LINCOLN BENEFIT LIFE COMPANY  : CASE NO.
5       Plaintiff              : 2:15-cv-06699-TJS
6     - vs -                   :
7  BRIAN CHABOREK              :
        Defendant              :
8  LINCOLN BENEFIT LIFE COMPANY  : CASE NO.
9       Plaintiff              : 2:15-cv-06700-TJS
10     - vs -                   :
11 BRIAN CHABOREK              :
        Defendant              :
12 LINCOLN BENEFIT LIFE COMPANY  : CASE NO.
13      Plaintiff              : 2:15-cv-06702 TJS
14     - vs -                   :
15 ROBERT BOWMAN, et al.       :
        Defendant              :
16

17        ORAL DEPOSITION OF VAL MUNCHEZ-VAN DER WAGT,

18    taken before Nancy R. Toner, Registered Professional

19    Reporter, Notary Public, at the offices of Gawthrop

20    Greenwood, 17 East Gay Street, West Chester,

21    Pennsylvania on Thursday, June 16, 2016, commencing at

22    10:20 a.m.

23

24        *NANCY R. TONER COURT REPORTING*
          *10 Arianna Lane*
          *Exton, Pennsylvania  19341*
25          *610-594-6139*

**2**

1    APPEARANCES

2

3  GAWTHROP GREENWOOD, PC
   BY:  JOHN E. D. LARKIN, ESQUIRE
4    17 East Gay Street
     Suite 100
5    West Chester, Pennsylvania 19381
     610-696-8225
6

7  DION, SOLOMON & SHAPIRO, LLC
   BY:  XAVIER HAYDEN, ESQUIRE
8    1801 Market Street
     Suite 606
9    Philadelphia, Pennsylvania 19103
     215-561-0877

10

11 CAROSELLA & ASSOCIATES, PC
   BY:  CHRISTOPHER J. AMENTAS, ESQUIRE
12   882 South Matlack Street
     Suite 101
13   West Chester, Pennsylvania 19382
     610-431-3300

14

15 DRINKER BIDDLE & REATH, LLP
   BY:  JASON GOSSELIN, ESQUIRE
16   One Logan Square
     Suite 2000
17   Philadelphia, Pennsylvania 19103
     215-988-2535

**3**

1                    INDEX

2

3  WITNESS:

4  VAL MUNCHEZ-VAN DER WAGT

5      By Mr. Larkin                    4,170

6      By Mr. Hayden                    164

7      By Mr. Amentas                   167

8

9

10 EXHIBITS:

11 LBL 1    Binders                      4

12

13 CONFIDENTIAL PORTIONS OF TRANSCRIPT:

14     Start    End

15     16       18

16     47       84

17     146      156

**COMPRESSED
COPY**

**4**

1        (Whereupon, on the record at 10:20

2    a.m.)

3        **VAL MUNCHEZ-VAN DER WAGT** was called

4    as a witness after having been first duly sworn

5    according to law, was examined, and testified

6    as follows:

7        ----------

8  EXHIBIT:

9        (Whereupon, LBL-1 was marked for

10   identification prior to the commencement of the

11   deposition.)

12       -- EXAMINATION --

13 BY MR. LARKIN:

14   Q.   Ma'am, good morning.

15   A.   Good morning.

16   Q.   My name is Jack Larkin. I represent a

17   number of the beneficiaries in the case who are the

18   defendants, along with Amanda Doherty who is

19   stepping into the room as well. She is also on our

20   team.

21       This is Xavier Hayden who represents two

22   of the beneficiaries. And that's Chris Amentas who

23   represents the estate.

24       We all have some questions for you today.

25   Before I jump into them, let me ask you have you

5

1  given a deposition in the past.
2      A.  Yes, I have.
3      Q.  Then you probably know there is no way to
4  stop an attorney from telling you the rules of the
5  deposition no matter how many times you have done
6  it. So I will have to do that now.
7          Basically we are constrained by the fact
8  that we have a court reporter, which means that I'm
9  going to ask you not to speak over me and I will do
10  the same, just because she can't transcribe
11  accurately when we are speaking over one another.
12          For the same reason, let me finish my
13  entire question so that she gets everything that I
14  say in response to your answer.
15          When you are giving a yes or a no, don't
16  just give me a head nod or shake and don't give me a
17  mm-mm or mm-hmm because it's very difficult to get
18  down. Give me full words like yes and no.
19          And probably the most important rule. My
20  assumption is going to be -- has to be that when I
21  ask a question, if you give me an answer, you
22  understand my question and that your answer is
23  responsive to it.
24          If you don't quite understand what I'm
25  asking or if you think it needs some clarification,

6

1  please ask me to do so. I will be happy to ask the
2  question in any number of different ways.
3          Beyond that, this is not an endurance
4  contest. There's obviously a very thick binder. I
5  want to ask you questions about a whole bunch of
6  documents that have been produced. I will say in my
7  defense we got 7 or 8,000 pages to begin with. So
8  I've tried to whittle it down a bunch.
9          If you need to stop for whatever reason,
10  please answer my questions so that you don't leave
11  in the middle of a question. But as soon as you do,
12  just throw up a hand and let me know that you want
13  to take a break either to get something to eat, to
14  drink, to go to the bathroom, or just to take a walk
15  around. Whatever you need.
16          Does everything that I have said make
17  sense to you?
18      A.  Yes, it does.
19      Q.  In that case, in the big binder in front
20  of you --
21      A.  Can I add one thing?
22      Q.  Sure. Please.
23      A.  I am getting over a cold so we might have
24  frequent breaks.
25      Q.  That's fine. In the big binder in front

7

1  of you, could you turn to Tab 1.
2      A.  (Witness complies with request.)
3      Q.  This is a Notice of Deposition that I
4  served on your counsel. Have you seen a copy of
5  this document before?
6      A.  Yes, I have.
7      Q.  My understanding is that -- on the second
8  page you will see there's a schedule of topics that
9  I intend to cover in this deposition.
10          My understanding is that you are prepared
11  to discuss all of them as Lincoln's corporate
12  designee with the one exception that, with respect
13  to claims handling, there may be some questions that
14  you are not able to answer and there's another
15  person who, if we need to go to, we can go to; is
16  that correct?
17      A.  Yes, it is.
18      Q.  In addition, if you go two pages in,
19  there's a second schedule that asks for any notes,
20  reports, memoranda, e-mails, or other documents
21  generated during the claim investigation, and the
22  portion of any underwriting manual, table, training
23  manual, or other document governing or setting forth
24  Lincoln Benefit's underwriting policies that support
25  the effect alleged to have been created by the

8

1  purported material misstatement, omission, or error
2  to the extent not already produced.
3          I see you don't have any documents with
4  you today. But last night we received about 900
5  pages of documents. Is it your understanding that
6  all the documents that I'm requesting in Schedule B
7  have already been produced?
8      A.  Yes.
9      Q.  In that case, if you could turn to Tab B
10  in Exhibit 1, this is an e-mail that I received from
11  Mr. Gosselin. You are going to see on a couple of
12  these documents there are highlighted portions. The
13  highlighted portions are purely so that I can direct
14  you to it that much faster.
15          The note here is there's a specific
16  underwriter who is familiar with the facts of the
17  case who assisted with the preparation of the
18  complaint, and who has provided all of the input on
19  behalf of the company in order to address the
20  underwriting issues raised in discovery.
21          I assume you wouldn't know if you provided
22  all of the information. But to the best of your
23  ability, does this describe you? Are you that
24  person?
25      A.  What was the caveat? I'm sorry.

9

1    Q.    I assume that you wouldn't know if you
2 provided all of the information. How could you?
3 Information could have come from another source.
4       But does this describe you? Do you think
5 you are that person?
6    A.    Yes.
7    Q.    In that case, if you could then turn back
8 to Tab A, this is the complaint that was filed in
9 one of the several cases. It's Docket No. 6702
10 which is the $600,000 policy. And we have fallen
11 into the pattern of using this complaint to talk
12 about most of the complaints in the case because it
13 tends to be over-inclusive. It has every claim.
14       If you could turn to Page 4, I'm looking
15 at Paragraph 28, Subsection A. This is describing a
16 question that was asked of the decedent, Paul
17 Godlewski, whether he had within ten years been
18 diagnosed with or sought treatment or advice for a
19 mental or nervous disorder.
20       What would qualify as a mental or nervous
21 disorder in answering this question?
22    A.    In relation to this case, a history of
23 anxiety, panic disorder, compulsive disorder,
24 depression.
25    Q.    When you say a history, does that require

10

1 a diagnosis?
2    A.    Yes.
3    Q.    When you say anxiety, I've been anxious in
4 the past. What kind of anxiety are you looking for
5 in order to make it into a mental or nervous
6 disorder?
7    A.    A diagnosis of anxiety by a licensed
8 professional.
9    Q.    Would it be fair to say anxiety disorder?
10    A.    Anxiety or anxiety disorder.
11    Q.    If a doctor tells me, Jack, you look
12 anxious right now, I'm diagnosing you as anxious,
13 that counts as a mental disorder?
14    A.    That's a hypothetical. But if the doctor
15 indicates that his diagnosis is anxiety, then we
16 would take that as a mental disorder.
17    Q.    Does every mental or nervous disorder that
18 is reported result in a change in the premiums?
19    A.    No.
20    Q.    What would you have to do in order to get
21 to a change in the premiums?
22    A.    Well, it depends on the attributes of the
23 disorder, the severity, the frequency, level of
24 treatment, the description, the impact it has on the
25 person's health as observed by the doctor and

11

1 reported.
2    Q.    How would that decision be made internally
3 by Lincoln Benefit?
4    A.    We don't diagnose.
5    Q.    Assuming that you have a diagnosis from a
6 doctor and the doctor had provided you with the
7 facts that you were interested in, what guideline
8 would you look at or what manual would you look at?
9 How would you decide how to rate someone?
10    A.    So we have something called a mortality
11 manual that we refer to and we use the Swiss Re
12 manual. And there are different sections that
13 relate to different disorders.
14       So we would be looking for the nervous
15 mood disorders, and then we would look to see based
16 on the specifics that are in the medical file where
17 that person falls. And also, any other coincident
18 or co-morbidities.
19    Q.    Is the mortality manual the same thing as
20 the Swiss Re manual?
21    A.    Yes.
22    Q.    Do you also use the Gen Re manual?
23    A.    On occasion. But primarily it's Swiss Re.
24    Q.    Why would you use one over the other?
25    A.    So the Gen Re manual would be used for

12

1 specific situations that come up that are not
2 covered by the Swiss Re manual. I'm sorry. The Gen
3 Re manual would come into play when the Swiss Re
4 manual doesn't cover something.
5    Q.    What if you have a situation that is
6 covered by the Swiss Re manual but the Gen Re manual
7 also covers it? Would you be allowed to exercise
8 your discretion?
9    A.    No.
10    Q.    You always --
11    A.    99 percent of our decisions come out of
12 the Swiss Re manual.
13    Q.    If you could turn to the next page,
14 Subsection B asks whether the decedent had within
15 five years a checkup, consultation, hospitalization,
16 illness, surgery, or medical or diagnostic test.
17       Let me start at the most broad. What is
18 the purpose of asking that question?
19    A.    To ascertain any medical consultations,
20 the purpose of that consultation, and the outcome.
21    Q.    My assumption is that hospitalization and
22 illness, a surgery, a medical test, a checkup -- in
23 and of themselves, those things would not change
24 your life rating; is that correct?
25    A.    Could you repeat that?

13

1    Q.  Sure.  There's a long list of, I'm going
2    to say, items.  None of them in and of themselves
3    without more would change your life rating.  So for
4    example, right now you are getting over a cold.
5    That's an illness.
6    A.  Mm-hmm.
7    Q.  I'm assuming that a cold would not change
8    your life rating.
9    A.  A cold aside, the purpose of these
10   questions are to ask about factual events that
11   occurred that will allow us to find out about a
12   person's health.
13       So each individual item that's listed is
14   something that we are interested in.  And then
15   subject to the additional details, we would be able
16   to determine whether or not it has an impact.
17       So if you were to say checkup or
18   consultation, just in and of itself, it's
19   meaningless until we get the balance of the details.
20   Q.  And that's what I was really trying to
21   find out.  If there's a hospitalization, now you
22   know there's a hospitalization and your question
23   then becomes, okay, for what.
24   A.  Right.  Where, when, what was the
25   diagnosis, et cetera.

14

1    Q.  What kinds of things would change your
2    life rating in the event of a hospitalization?
3    A.  They are super numerous.  Can you be more
4    specific?
5    Q.  If you had head trauma and you went to the
6    hospital for head trauma, would that change your
7    life rating?
8    A.  It depends on the outcome.
9    Q.  What is the variable there?
10   A.  So you have to be more specific, because a
11   head trauma can be a slight bump or it can be, you
12   know, a brain injury.  It can be, you know, a skull
13   fracture or a number of things.
14   Q.  Would a concussion in and of itself
15   without more -- and that's all the information that
16   we have in this case, which is why I'm asking
17   specifically about a concussion which I know is a
18   little vague.  Would that automatically change your
19   life rating?
20   A.  Well, it wouldn't impact the life rating,
21   but it would determine whether or not we would
22   provide a policy.  So we would need to refer to our
23   manual regarding concussions and head injuries.
24       So if it's a concussion and there's no
25   residuals, no other problems, we normally wait a

15

1    period of six months to make sure there's no
2    manifestation of disorder.  And if everything is
3    fine, then we will issue.
4        And if the record doesn't reflect that
5    there are any problems, then after a six-month
6    period, then we will consider it a standard issue.
7    Q.  What are the kinds of concussion-related
8    problems that you would not underwrite if you saw?
9    A.  That's a really broad question.  Can you
10   be more specific?
11   Q.  I don't know that I can because I'm not
12   really sure what the issues are.  You said that if
13   there was a concussion you have a six-month waiting
14   period to see if there were complications or issues
15   that arise from the concussion.  Is that correct?
16   A.  Right.  So maybe we should refer to the
17   documents that we sent that cover this issue and
18   that way we can look at that.
19   Q.  I would like to mark the transcript here
20   as confidential.
21       (Whereupon, start of confidential
22       portion of transcript.)
23
24
25

19

1          (Whereupon, end of confidential
2      portion of transcript.)
3  BY MR. LARKIN:
4      Q.  The next question in the complaint --
5  going back to Tab A of Subsection 1 of the large
6  binder. The next question is whether the deceased
7  planned to spend more than two weeks outside the
8  United States in the next year.
9          Is there a listing of countries that you
10 would consult in order to determine whether your
11 plan to be outside of the United States would affect
12 your life rating?
13     A.  Yes.
14     Q.  Where is that listing of countries?
15     A.  That's in the RGA manual.
16     Q.  The RGA manual is Tab 48 in the big
17 binder. How do you rate countries outside the
18 United States?
19     A.  So depending on the destination and the
20 risk of a person, an American -- I shouldn't say an
21 American -- one of our customers going there for an
22 extended period of time, there can be a rating
23 that's attached. In this case there was none.
24     Q.  Why not in this case?
25     A.  Because the destinations that we knew

20

1  of -- and I think it was -- actually, it was
2  Istanbul, Turkey, and Israel that had been past
3  travel, by the way -- they were not ratable.
4      Q.  What does that mean?
5      A.  Ratable meaning that for the purpose of a
6  visit to that country for business, I think, that
7  was being conducted was not a risk factor that we
8  would need to charge extra for.
9      Q.  What about Turks and Caicos?
10     A.  We would not rate for that either.
11     Q.  Is there any country that Paul Godlewski
12 traveled to, to your knowledge, that you would rate
13 for?
14     A.  No.
15     Q.  At Paragraph 33 on the same page --
16     A.  I'm sorry. We're on A?
17     Q.  Yes. Page 5 of Tab A within Exhibit 1.
18     A.  Okay.
19     Q.  This doesn't parse out the individual
20 effect of each of the misrepresentations that are
21 alleged. But there's a blanket claim that had
22 Godlewski provided truthful information, Lincoln
23 Benefit would not have reinstated the policy.
24         If Turks and Caicos is not ratable, it
25 sounds like that is not a variable in your decision

21

1  to reinstate the policy or not. Is that correct?
2      A.  Am I reading the same thing that you are?
3  You are on Page 5?
4      Q.  Page 5, Paragraph 33.
5      A.  There's a statement that says: Had
6  Godlewski provided truthful information -- and it
7  doesn't say what that information is in this
8  sentence, Lincoln Benefit would not have reinstated
9  the policy.
10         That's a truthful statement, but it's not
11 related to his travel.
12     Q.  Okay. Is there a reason that his travel
13 was included in the complaint then?
14     A.  Very early on during the early part of
15 this investigation, we were not aware of all the
16 places that he had traveled. But we knew that there
17 were more destinations that we had been aware of and
18 that had been admitted to on the application.
19         But we knew that it was frequent and --
20 well, it was frequent.
21     Q.  If you could then turn to Tab 2.
22     A.  Okay. Got it.
23     Q.  This is an authorization for release of
24 health-related information that Paul signed in
25 connection with one of his applications for life

22

1  insurance. Why do you request these from your
2  insureds?
3      A.  So in general, every insurance company
4  requires an authorization from a customer before
5  they can do any investigation. We actually have two
6  authorizations. This is one. And this one relates
7  mainly to medical information where the other one
8  relates to investigations in general.
9          But this one, the reason that we get it
10 signed -- and we get it signed by every customer up
11 front -- is in case we need to request additional
12 information so that we don't have to go back to the
13 customer and ask them to sign it.
14         So we just get it as one of the submitted
15 forms that, you know, come automatically with a new
16 business application.
17     Q.  When you say request additional
18 information, you mean from people other than the
19 applicant?
20     A.  Yes.
21     Q.  So health providers, employers, whomever
22 else?
23     A.  Primarily health providers.
24     Q.  You did conduct a medical investigation as
25 part of the underwriting process in this case; is

23

1  that correct?
2      A.  Well, yes, we did.  Which case?  Is it 318
3  you're referring to?
4      Q.  Well, let me be a little more broad.  For
5  each of the policies that Paul had, did you conduct
6  a medical investigation?
7      A.  Medical is a general term.  That includes
8  lab results, vitals, bodily fluids.  We do do that
9  as part of our underwriting work up.  So that's
10  considered medical, but it's medical that we
11  request.
12          The other part of that medical would be to
13  obtain medical records from a facility that has
14  them, whether it's an individual physician or a
15  medical center.
16      Q.  Did you request records of a physician
17  with respect to each of Paul's life insurance
18  policies in this case?
19      A.  Only on two.
20      Q.  Only on two?  Why those two?
21      A.  It had to do with the face amount that was
22  being applied for.  And we have standards for
23  selection.  When a face amount reaches a certain
24  level, we will get medical records, just part of a
25  routine work up.

24

1      Q.  Now, the search that you performed in
2  advance of issuing the policy as part of the
3  underwriting for those two policies was -- it didn't
4  reveal as much information as the search you
5  conducted as part of the claims process.  Otherwise,
6  there wouldn't be a mismatch between the two.  So
7  why the difference?
8      A.  What was the question?  I'm sorry.
9      Q.  Why is there a difference between the
10  search you performed as part of the underwriting
11  process and the search you performed as part of the
12  claims process?
13      A.  Oh.  Because the proposed insured, when he
14  completed his applications and his Part 1 and Part 2
15  examination, all of the information that we
16  provided, including the inspection interview,
17  focused on one physician, Dr. Cuozzo.  I'm not sure
18  if I'm pronouncing that correctly.
19          But he provided us with very limited
20  information about his health.  And it was only
21  post-death that we discovered that there were a
22  cadre of physicians that we were not aware of.
23  There was a lot of medical history that had never
24  been admitted, shared.
25          So yes, that's what the difference is, is

25

1  what we knew and what we investigated.  In fact, the
2  name of the physician that he gave us to go to to
3  validate his medical history had a very narrow slice
4  of his history.
5      Q.  If you could to Tab 3, first off, a large
6  section of the discovery that you have produced
7  is -- it looks to me like it's all in the same font
8  and it looks like it's all part of the same computer
9  program.  What is this program?
10      A.  So this is the section of what we would
11  call a status print.  A status print is a summary
12  that is printed out after a file has been completed
13  in the underwriting area.
14          So we call it an underwriting work bench.
15  And it is the computer program that we use --
16  actually, it's LUS, life underwriting system, where
17  we gather all of our requirements, we post all of
18  our requirements, we diary our work up, we make
19  notes about our evaluation.  All of that is in this
20  section.
21          In addition to that, it also receives
22  electronically a feed from our laboratory that has
23  the lab results.  Again, that's bodily fluids,
24  vitals.  Motor vehicle report as well.  That's all I
25  can think of right now.

26

1      Q.  What is an MIB?
2      A.  An MIB is a report that we receive --
3  well, the MIB is an institution that's located in
4  Massachusetts.  What it does is it services the
5  insurance industry with a record of information for
6  a person who has applied for insurance previously
7  and a report has been made about them from another
8  insurance company.
9          So if we search -- that's the term we
10  use -- the MIB and a person has never applied
11  before, then there will be no record.  If they have
12  applied before, as is true in this case, and a brief
13  report was made and it was done by us, then when we
14  search the next time, we are going to get a hit and
15  that hit will show what information is reported.  So
16  that's what the MIB does.
17      Q.  I have highlighted the line here that says
18  so many that not enough room to put them all in MIB.
19      A.  Yes.
20      Q.  What does that mean?
21      A.  So at this point in time, the insured had
22  applied for a lot of different policies.  And there
23  is a -- actually, is that attached in here, the MIB
24  part of this so we can refer to it?  No.  I thought
25  it would be good for illustrative purposes.

27

1 So what it is saying is that the number of
2 hits that we received back -- IAI is insurance
3 activity index, which also shows the number of times
4 an insurance company searched the bureau.
5 There were such a number of them that they
6 were unable to be reflected on status prints.
7 Q. The LUS document that we have here, it
8 sounds like you're saying it's going to be
9 incomplete; it doesn't include necessarily
10 everything because there was so much information
11 that you were not able to enter everything in.
12 A. I would have to look at it, because this
13 note and what was listed, when I looked at this case
14 before in the past, I believe there were, like, nine
15 or ten pages. I thought it was kind of complete.
16 So this note that there's not enough room
17 to put them all in, I would have to see is there a
18 cut off that says, you know, we are missing one or
19 two. Or was there a second sheet that had to be
20 provided, which I think is what happened.
21 Q. Got it. Could you turn to Tab 4. This is
22 similar. It's a note that's in some kind of a
23 different font that says probably due to so many
24 existing policies, unable to enter any info notes in
25 LUS.

28

1 A. Yes.
2 Q. What does that mean?
3 A. So there were multiple policies that were
4 being reviewed at the same time. And the
5 underwriter actually placed her notes not in this
6 file but in the companion file.
7 My understanding of what may have occurred
8 is that it just kind of ran out of room. She wasn't
9 able to put any more information in there. Like,
10 there were a finite number of characters.
11 Q. Do you know if the information was entered
12 somewhere else?
13 A. Yeah. On a companion file. I can't
14 speculate what the number was, but there was another
15 number that was pending at the same time.
16 Q. Is that one of the policies that's at
17 issue in the cases that we are here for today?
18 A. I believe so, yes.
19 Q. If you could turn to Tab 5.
20 A. Can I just make another note?
21 Q. Sure. Please.
22 A. The whole purpose of this note also is
23 because she wanted to write down and reflect what
24 her assessment was since she couldn't put it in the
25 other file. So it should appear here and in the

29

1 other file.
2 Q. You don't know what companion file that
3 was?
4 A. We could look it up. I couldn't tell you
5 off the top of my head.
6 Q. You don't know what the dollar figure or
7 the policy value was or who the beneficiaries were,
8 any other identifying information?
9 A. It should be in here. I don't know how
10 you have it listed in your books.
11 Q. I mean, we have many thousands of pages.
12 If I just give you a box full of paper, I don't
13 think you're going to be able to find it.
14 A. Okay.
15 Q. Let's look at Tab 5. This is another one
16 that notes keep getting errors on 01T1966318 when
17 trying to add notes, notepad appearing to be full.
18 What's that?
19 A. It's the same thing. Apparently there was
20 a finite number of notes that could be added into
21 this particular file.
22 Q. On the last one, you said that there was a
23 companion file that notes were entered into. Do you
24 know about that with respect to this?
25 A. We could research it now if you would

30

1 like.
2 Q. Well, I would like, but I don't know how
3 you would do that. I'm asking you. And it sounds
4 to me like you're saying you don't know.
5 A. I do know, but I don't have it all
6 memorized.
7 Q. Was there a companion file in this case
8 that the notepad was entered into?
9 A. Yes, for sure.
10 Q. Do you know what the companion file was?
11 A. These documents that you have in front of
12 me are out of context. So the entire record is not
13 attached to the sheet. This is one page out of a
14 status print. So each status print should run about
15 25 pages; but for this, you only have this document.
16 Q. Understand, I don't blame you if you don't
17 know. It's not a moral failing or anything. It's
18 just that I can't provide you with all of the
19 documents. If I did, we would spend all seven hours
20 answering my first question.
21 So it sounds like with the information in
22 front of you, you don't know. Is that correct?
23 A. I would like to take a look to see if I
24 can find it.
25 Q. Sure. Please.

31

1   A.   Do you have the rest of the documents
2  somewhere?
3   Q.   Not printed out.
4        MR. GOSSELIN:   What is the pending
5   question?
6  BY MR. LARKIN:
7   Q.   The pending question is:  Do you know if
8  the information that was not entered with respect to
9  this note because notepad appears to be full was
10 entered into a companion file?
11       With respect to Tab 4, you knew the
12 answer.  You said yes.  With respect to Tab 5, you
13 have said this is out of context, you have not seen
14 the whole 25-page print out.
15       So it sounds to me like you don't know the
16 answer to the question, which is fine.  You're not
17 required to.
18   A.   Well, I do know, but you haven't provided
19 me with the documents.
20   Q.   Is it yes or no?
21   A.   State the question again.  Let's start
22 from the beginning.  Sorry.  It's getting a
23 little --
24   Q.   Okay.  In Tab 5, there's a note that says
25 keep getting errors when trying to add notes,

32

1  notepad appears to be full.  My question is:  Do you
2  know if the notes that they were trying to enter
3  were entered into a companion file?
4   A.   If you provide the rest of the documents,
5  I could tell you that.  We can look at that
6  together.  But I will tell you that several seconds
7  later, there was a note entered into this file; and
8  that was that this reinstatement was approved.
9   Q.   Why would notepad be full if there was
10 another note that was entered several seconds later?
11   A.   That I don't know the answer to.
12   Q.   Why would the decision to approve be made,
13 it looks like, 13 seconds after this was noted?
14   A.   Because she approved the coverage and put
15 the policy back in force.  Maybe she wanted to make
16 a longer note.  I have no idea.  I can't speculate.
17   Q.   If you could turn to Tab 6, this is a note
18 from April 22 of 2013 that notes that the last labs
19 were done on March 27th of 2012, which was pretty
20 close to a year.  Is there any rule about how
21 frequently labs have to be performed or how recently
22 labs have to be performed?
23   A.   We have a guideline.  But it's up to the
24 underwriter to determine whether or not they are
25 comfortable with issuing labs result that we have.

33

1   Q.   What is the guideline?
2   A.   The guideline is that labs results are
3  usually good for about a year when normal.
4   Q.   What kind of discretion does the
5  underwriter have?
6   A.   Full discretion up to their limit of
7  signature authority.
8   Q.   So they could excuse labs all together if
9  they wanted to?
10   A.   Yes.
11   Q.   Is that written in any policy manual?
12   A.   Yes.
13   Q.   And that's the Lincoln Benefit Life
14 manual, not the Swiss Re manual?
15   A.   That is correct.  It's the life
16 underwriting policy.
17   Q.   If you could turn to Tab 7, this is,
18 again, the same kind of a note.  The labs were
19 performed over a year but close enough.  The EKG was
20 done close enough also.  So that would be the same
21 answer, I assume, the underwriter was exercising
22 discretion?
23   A.   Yes.  We had seen this customer for many
24 years.  He was very consistent in the history that
25 he provided.  We had evaluated him.  We had run

34

1  labs.  We had done exams.  We were pretty
2  comfortable that we understood his state of health.
3        So if the underwriter decided to go
4  without an updated lab result or examination, then
5  that was within their discretion.
6   Q.   Are there any policies about allowing an
7  Allstate agent to be the agent broker on their own
8  policy?
9   A.   Are there any policies that allow -- yes.
10 I couldn't tell you what that policy is or how it's
11 written.  I didn't memorize that, unless you have it
12 in here.
13   Q.   Well, it hasn't been provided to me.
14   A.   Well, I can tell you that an agent can
15 write an application on himself or herself.
16   Q.   Are there any restrictions on that?
17   A.   Nope.
18   Q.   Is there any preferential treatment that
19 you get?
20   A.   Nope.
21   Q.   If you could turn to Tab 8, there's a
22 bunch of waivers here.  Why would an HIV consent
23 alert be waived?
24   A.   So this is all based on system constraint
25 terminology.  The fact that it says waived does not

**35**

1 mean that it was waived. It means that it was
2 removed from being outstanding. So we do have an
3 HIV consent form in the file.
4     Q. Isn't there a notation that says received?
5     A. Mm-hmm.
6     Q. Why would you use waived instead of
7 received?
8     A. It's a curiosity of the program. The
9 documents will be in the file. We need to keep it
10 out of being in a pending status. We know that we
11 have the document. We just waive it on the system
12 to remove it as being a pending case.
13     Q. If you put down status received, then that
14 won't do the same thing?
15     A. Usually those received are electronic
16 receipts. So we have electronic feeds that come in
17 from our Exam 1 company. There are electronic feeds
18 for, like, the lab results, exam form, motor vehicle
19 report, that type of thing.
20     So when those come into the system, they
21 flick the switch and say received. So those are
22 usually electronic.
23     Q. So where it says other requirement,
24 financial info, and it's waived, I understand you to
25 be saying that that would be received, in fact? You

**36**

1 have the financial requirement at that point?
2     A. No. I didn't say that. I just said
3 sometimes that's why you will see waived instead of
4 received. We do have an inspection interview.
5     Q. Do you know whether, just looking at this
6 document, would you be able to tell whether
7 something had actually been received or if it had
8 been waived?
9     A. Sure.
10     Q. How would you do that?
11     A. By looking at the balance of the file.
12 But this page is just by itself. It doesn't have
13 the rest.
14     Q. That's why I asked the question. From
15 looking at this document, would you be able to tell
16 whether you had received the document based on
17 whether it was marked as received or waived?
18     A. No. But I can tell by looking at the
19 underwriter notes. And I can tell you that I did
20 review the inspection interview. So there is one in
21 the file.
22     Q. If you can go to 10, here it says
23 age/amount screening bypassed. What does bypassed
24 mean?
25     A. I would not be able to tell you what that

**37**

1 means.
2     Q. What is age/amount screening?
3     A. So by the way, I could be more exact if we
4 had the entire file. This is, again, just a single
5 page.
6     Q. I just want to know what age/amount
7 screening means.
8     A. Oh. So every application that arrives, we
9 have a requirement chart and based on the age of the
10 customer and the amount of insurance they are
11 applying for. So you have a matrix that will decide
12 what minimum requirements we would need to
13 underwrite them.
14     In his case, he had a number of
15 applications that were being evaluated at the same
16 time. So this possibly could have been that since
17 the requirements were on another case that was
18 pending, that this was bypassed. But I don't know
19 that without looking at the entire document.
20     Again, this is just -- in fact, I can't
21 even tell what case this comes from because it
22 doesn't have all the other sheets attached.
23     Q. A lot of my questions, just to be clear,
24 are me trying to figure out what these codes mean.
25 So in some cases I'm going to be asking you about

**38**

1 specific information about Paul Godlewski. And in
2 other cases, like right now, I literally just want
3 to know what age/amount screening means.
4     I am not holding you to be responsible for
5 every document with respect to at least that
6 question.
7     A. I am just saying that I would be able to
8 provide a more thorough and complete answer if we
9 had the entire file for each one.
10     Q. I understand. You've said that a few
11 times now. I've got close to 9,000 pages. We just
12 can't go through them each time. It would take too
13 long. If you could go to Tab 11.
14     A. I was just going to say that when we
15 provided them, they were probably all together in a
16 package.
17     Q. Well, they were not unfortunately. Why
18 don't we go to Tab 11. What is this?
19     A. So this is a tool that the underwriters
20 use at the end of their underwriting evaluation. We
21 have a method that we use. It's -- sorry -- it's
22 specific to Allstate that allows us to take a look
23 at the person who has -- maybe they have a rating.
24 Maybe they have been assigned some debits because of
25 their history.

**39**

1    And we can use this tool to pick out those
2 parts of their profile that are very positive and
3 maybe even notice any that are negative and
4 determine whether or not we might be able to provide
5 them a better rating because their overall profile
6 is better than the average person.
7    So this would allow us to take a person
8 from one rating class -- I should say discount
9 class, not mortality rating class -- to a lower one
10 or a better one.
11    Q.   What is a debit? You just used that term.
12    A.   That's a method that an underwriter uses
13 to identify the increase in mortality.
14    Q.   What does that mean, if you could just
15 unpack that a little bit for me?
16    A.   So if you're looking at -- say we have a
17 continuum. In the center is a standard person. You
18 could have a chart for male and you could have a
19 chart for female. But let's just take a standard
20 person male.
21    This male could either be a smoker or a
22 nonsmoker. That would be a separate chart. But
23 your standard nonsmoker. Well, if you have positive
24 profile attributes, we are going to give you
25 discounts.

**40**

1    This is a standard rate which translates
2 into a premium. So we can give you discounts to
3 that because you present a better risk than the
4 average person.
5    If you have debits, that means that in
6 increments of usually 25 percent, your mortality is
7 higher than the average person. So 25 debits would
8 move you to standard plus 25 debits. And that would
9 reflect in your premium. And that goes on to 50
10 debits, 75, 100, et cetera.
11    That's what the debits are. That's it.
12    Q.   In the production, there are probably 50
13 or so pages like this one. Some of them have
14 information filled out. Others do not. Is there a
15 reason that an agent would leave in the file a
16 healthy credits form like this that had not been
17 completed?
18    A.   This is not completed by an agent. It's
19 completed by the underwriter at the time of issue.
20    Q.   Thank you for the correction. Is there a
21 reason why you would fill out Paul Godlewski in the
22 name category and the policy number and not include
23 the other information?
24    A.   When there are no debits or credits to
25 provide -- by the way, this sheet is automatically

**41**

1 produced every time an underwriter makes an issue
2 decision. If there's nothing to provide to give him
3 credits, it'll just simply print out with the
4 person's name and policy number.
5    Q.   All right. In other instances, there are
6 sections that are filled out. Does that reflect
7 different information that the underwriter had?
8    A.   That, and not -- this cannot be used on
9 every type of plan. So depending on the plan, it'll
10 appear completed or it won't appear completed at
11 all.
12    Q.   Would this be something you would use on a
13 true term plan?
14    A.   At the time, I believe we did use this on
15 true term, on some of those policies.
16    Q.   What about a VUL?
17    A.   Same.
18    Q.   If you could turn to Tab 12, this is two
19 different pages. It lists a number of lapsed plans
20 and surrendered or other applications.
21    Do you know if any of these lapsed or
22 surrendered policies included a medical
23 investigation?
24    A.   We can look by looking at the file.
25    Q.   We didn't receive information about the

**42**

1 surrendered or other applications, and the lapsed
2 plans that did not go back into force we didn't
3 receive any information about at all.
4    So basically, if he didn't have that plan
5 active at the time, I don't have any information
6 about it, which is why I'm asking you is it possible
7 there would be additional medical information for
8 these lapsed or surrendered plans?
9    A.   Anything is possible.
10    Q.   Would you in the normal course of events
11 conduct an investigation into the plans that are
12 listed here? Can you tell that?
13    A.   We investigate every application that
14 comes in for insurance coverage.
15    Q.   You said that some applications you would
16 perform an additional investigation where you would
17 go to the medical provider. Can you tell from
18 looking at any of the plans that are lapsed or
19 surrendered here whether you would have done that in
20 those cases?
21    A.   Not from this summary, no.
22    Q.   What is the dollar figure that's necessary
23 in order to make that happen?
24    A.   It's not only the dollar figure. It
25 depends on the age and also depends on the

43

1 accumulated or the aggregate amount of coverage that
2 is in force at the time.
3 So the underwriter here was trying to
4 distinguish which cases she needed to be concerned
5 about that were in force and which cases were not in
6 force that she did not need to be concerned about
7 when coming up with that aggregate level in order to
8 identify requirements.
9 Q. Looking at Godlewski 1968, which is the
10 second page of Tab 12, I note that on the final
11 surrendered or other application, there's a notation
12 that says dollar symbol 3X2 driving record. What
13 does 3X2 mean?
14 A. So this policy that was -- you said 1968?
15 Q. Bates numbered 1968.
16 A. Okay. Got you. So policy ending in 691
17 was a term plan, ten years, face amount was
18 1.4 million. The policy was written on or about
19 June of 2006. It was issued at standard nontobacco
20 rates. And he was charged an extra premium of $3
21 per thousand to face amount for a period of two
22 years based on his driving record.
23 I do know from memory, which I do recall,
24 that it was based on speeding tickets and I think
25 driving while suspended. That policy was never

44

1 placed. In other words, he did not accept the
2 policy.
3 Q. Why would the other policies not include
4 that additional premium?
5 A. Because when we rate a motor vehicle
6 record, it's based on time and place. If your
7 application comes in and the speeding ticket is
8 now -- let me back up.
9 We have a chart. And the chart shows us
10 that, depending on the incidents, the type of
11 incidents, and date of occurrence as opposed to
12 today's date whether or not that person is still at
13 risk or in a risk period for either reoccurrence, et
14 cetera. So if additional applications that come in
15 and they were past the period of time where it would
16 be rated and we are no longer concerned about an
17 older speeding record, then they would not have that
18 rating.
19 Q. How long a period is that?
20 A. This one was added for a period of two
21 years. So that would have been two years from June
22 of 2006 until -- again, we would have to get the
23 exact date from the policy, which is not here.
24 Q. Well, I don't have the policy. So I can't
25 help you with that.

45

1 A. Okay. I can tell you that it was added
2 for that policy for that period of time. And at the
3 end of two years, it automatically falls off.
4 Q. And it looks like there was a policy that
5 lapsed where there is no notation about the dollar
6 figure 3X2. The policy seems to have lapsed in --
7 it was applied for in 12 of 2006. So why does 6 of
8 2006 have the additional money for the driving
9 record but 12 of 2006 doesn't?
10 A. Because December of 2006 is six months
11 later. So it was probably outside of the range to
12 be rated.
13 Q. I may have misunderstood you. I thought
14 it was two years from June.
15 A. No. That was for that policy, that period
16 of time.
17 Q. Understood. If you could turn to Tab 13,
18 these are answers to interrogatories that Lincoln
19 Benefit provided. If you could turn to Page 3, this
20 is a response to my question asking for every
21 material misrepresentation or omission that's on the
22 application.
23 And the first one that's listed is
24 Godlewski was hospitalized at the Robert Wood
25 Johnson University Hospital in 2012.

46

1 What is it about that hospitalization that
2 would have changed his life rating?
3 A. It would not have changed his life rating.
4 We would not have issued him a policy.
5 Q. Why would you have not issued him a
6 policy?
7 A. Because the reason that he had been
8 admitted to the hospital for two reasons. One is
9 that he had overdosed on prescription medication and
10 it had been mixed with alcohol.
11 Q. What makes you say that?
12 A. It's in the record. Is that record here?
13 Q. It is at a later page. There's a report
14 that he went into the hospital for that purpose.
15 His blood content when it was taken doesn't reflect
16 either of those things.
17 Would he have an appeals process? Could
18 he have tried to convince you that that was not the
19 real reason he was entered into the hospital?
20 A. We would have deferred to the medical
21 facility that recorded it because they are licensed.
22 They are the professionals that put this to paper.
23 Q. If there is a diagnosis that that's what
24 he was there for, that makes sense to me. If
25 there's a note in the file that just says that's

1    what he's here for, is that it?  Case closed, you're
2    done if you see a note in the file?
3         A.   A single note or multiple notes?
4         Q.   Either.
5         A.   Multiple notes for sure, yeah.  Even a
6    single note.  If it says that's why he's here,
7    that's their assessment and observation.  That's
8    what we're going with.
9         Q.   Where is it in the Swiss Re manual or any
10   other manual that says that if you are treated for
11   an overdose you just don't get coverage?
12       A.   We can go back to that other book.
13       Q.   And we can mark the record as confidential
14   from here.
15            (Whereupon, start of confidential
16       portion of transcript.)
17
18
19
20
21
22
23
24
25

48

1          (Whereupon, start of confidential
2    portion of transcript.)
3          THE WITNESS:  So there's two things
4    that we need to be concerned about.  One was
5    his alcohol usage and the drug usage.  Even
6    though they are prescription drugs, he had used
7    them in a manner that they were not prescribed.
8    And by mixing them, he ended up with a health
9    impact.
10          So we will start with alcohol abuse.
11   You should be on 5546.
12   BY MR. LARKIN:
13   Q.   Yes.
14   A.   So this is the cover page for alcohol
15   abuse life ratings.  If you go to the next page, we
16   are going to go to no history of treatment, no
17   history of dependence or addiction, because we don't
18   know that to be the full -- well, this is hindsight.
19   So we are just basing this just on this one record,
20   right?
21   Q.   Sure.
22   A.   So based on the fact that he had had drug
23   usage -- I'm sorry -- alcohol usage with drug usage,
24   he would be considered declined.
25   Q.   I am just looking for where that is.

49

1    A.   I am just getting there.  I'm sorry.
2    There's a couple of sections here.  Let's see what
3    is the best way to get you there.
4          On 5548, he would be listed as an
5    untreated person.  I think at the time of his
6    discharge, they did recommend that he go to rehab.
7    Actually, I would be much more comfortable if I had
8    the records in front of me, but you don't have those
9    here.
10   Q.   I am trying to figure out what it is in
11   this guideline that makes him a decline.  And you
12   are saying that on Page 5548, because he is
13   untreated, it looks like that requires that he have
14   either an alcohol dependence or an addiction and
15   alcoholism.  Because I am untreated right now.
16   A.   Yeah.  So let's not get too ahead of
17   ourselves.  I won't say anything until I can provide
18   it to you.  I will walk you there.
19          So we have alcohol dependence or
20   addiction, alcoholism, untreated, less than two
21   years would be a postpone.  And that's on 5548.  I
22   just want to add to that the drugs also.
23   Q.   That makes sense, but I want to be clear.
24   This presumes that he has alcohol dependence or
25   addiction or alcoholism?

50

1    A.   Right, based on what the record reflected.
2    Q.   And bear in mind there's a difference of
3    opinion as to whether he was an alcoholic.  So it
4    sounds as if what you're saying is if, in fact, he
5    was not an alcoholic, then that particular section
6    of the guidelines would not apply.  But it's your
7    contention that he is?
8          MR. GOSSELIN:  Objection.  You can
9    answer.
10          THE WITNESS:  We don't make the
11   diagnosis.  What we do is that we look at the
12   records and see what they say.  And if the
13   physician says that this is the reason the
14   person is here, these are all the observations
15   over the three or four days that he's in the
16   hospital, this is input that they have, this is
17   a recommendation that they have made, then
18   that's what we go by.
19          We are not diagnosticians and we
20   don't attempt to make the diagnosis.  We just
21   base it on what is written in the record.
22   BY MR. LARKIN:
23   Q.   So you're telling me it's your
24   recollection that there's a diagnosis of alcoholism,
25   alcohol dependence, or alcohol addiction for Paul

51

1    Godlewski?
2    A.   I didn't say that, no.
3    Q.   The section of the guidelines that you are
4    pointing me to looks like they only apply in that
5    case.
6    A.   Well, let me finish answering your
7    question for the whole section of this.  But I would
8    also like to request that medical record about his
9    hospitalization so that we are talking about it at
10   the same time that we are reviewing it.
11   Q.   Okay.  I just want to know right now what
12   it is in this guideline that, based on the
13   description you have given me, he overdosed on a
14   mixture of prescription medication and alcohol.
15   A.   Right.
16   Q.   Where is it in these guidelines that as a
17   result of that -- these are your responses to
18   interrogatories.
19   A.   Right.  So as an underwriter, I look at
20   the history and I say I have a person who has
21   alcohol usage mixed with prescription medication.
22   Based on that, I'm going to postpone him for a
23   period of two years.
24          We have drug and alcohol abuse treated
25   concurrently.  There are additional factors.

52

1   History of mood disorder, stress, or adjustment
2   disorder.
3       Q.   And these are all under the heading
4   alcohol dependence or addiction, alcoholism?
5       A.   Yes.  Then we have another section called
6   alcohol abuse that is descriptive of what an
7   underwriter is looking for or looking at when they
8   are evaluating risk, especially when we have
9   symptoms, we have observations, we have assessments,
10  and we are trying to determine what their risk is,
11  what their mortality is.  So we have that abuse
12  section.
13      By way of medication that he was on, that
14  we find out about the history of the anxiety and
15  what have you, we know what medications he took at
16  the time.  And we would go to the anxiety in the
17  nervous disorder section and we would look at the
18  combination of alcohol and a nervous disorder.
19      Q.   Is there a table that specifically deals
20  with the combination of alcohol and a nervous
21  disorder?
22      A.   Yes.
23      Q.   Which table is that?
24      A.   So the one that we just looked at.  And
25  then under anxiety.

53

1       Q.   I don't see anxiety on this table.
2       A.   Are you in the abuse section, alcohol?
3       Q.   I'm in alcohol.
4       A.   Let me just go back there.  So 5549, there
5   are other considerations, additional factors,
6   history of mood disorder, stress, or adjustment
7   disorder.
8       Q.   And anxiety is a mood disorder?
9       A.   Yes.  Stress disorder.  He was also
10  treated for stress.
11      Q.   And this all falls within the category of
12  alcohol dependence or addiction, comma, alcoholism?
13      A.   I think probably it would be more accurate
14  to say that when you look at the body of medical
15  records that we received from Dorfman, from the
16  hospitalization that he had in 2012, the
17  hospitalization in 2013, and also Dr. Linet's
18  records, when you look at all of that body of
19  information, we have a very clear picture of a
20  person who has an alcohol use problem.
21      We would probably put him under alcohol
22  abuse in order to rate him.
23      And then in combination with these nervous
24  disorders, the fact that his nervous disorder had
25  never been completely stabilized, there's a

54

1   consideration about that just by itself that he has
2   a condition that has not yet been stabilized.  They
3   keep changing the medication.  They keep increasing
4   the medication.
5       And then there's a situation where he
6   takes it into his own hands to say I'm going to use
7   alcohol and my prescription medications to
8   self-treat myself.
9       All of that is an abusive profile.  And
10  that's where we would say that, no, we would not
11  issue someone who had this history.  So you have to
12  look at each section of these and piece together the
13  profile of the individual and what our mortality
14  manual says.
15      Q.   A moment ago you said you were not
16  diagnosticians.
17      A.   Right.  We're not.
18      Q.   Now it sounds like you're saying you would
19  look at the picture holistically and you would make
20  your own evaluation of whether there was alcohol
21  abuse?
22      A.   No.  What we do is that we use our rating
23  tables that closely fit the situation or the details
24  and the facts that we have been provided.
25      Q.   The next number is No. 2 which is the

55

1   psychiatry unit at Robert Wood Johnson University
2   recommended Godlewski seek outpatient treatment at
3   the Princeton House Behavioral Health after he was
4   discharged.
5       Are you automatically bumped out of
6   coverage if you're recommended for outpatient
7   treatment?
8       A.   Yes.  And depending on the time.  So in
9   this case, again, you have to look at the fact that
10  we are dealing with someone who has both alcohol and
11  prescription drug abuse that has ended up in an
12  emergency situation, a health concern situation.  He
13  was actually injured during this period of time.
14      So if he's referred to a psychiatrist for
15  further evaluation and treatment or counseling, we
16  would postpone that.  We would not make a
17  decision -- I'm sorry -- we would make a decision.
18  We would decline the coverage until some later point
19  in the future when everything had stabilized.  He
20  was not stable at the time.
21      When he was discharged, he was told to go
22  and seek, you know, psychiatric help.
23      Q.   What does stable mean to you?
24      A.   Stable for the purposes of underwriting is
25  someone who has a condition and that condition has

56

1   been brought under control so the person can
2   function.
3       Q.   He was going to work every day. He was
4   interacting with people every day. He was, by at
5   least some definitions, I suppose, functioning.
6   Seems like he was criminal most of the time so I
7   guess maybe not.
8           What do you have to do in order to
9   function?
10      A.   You know, you look at the doctor's
11  records. I think Dr. Dorfman probably provided the
12  best profile of him. He met with him at one point
13  every month and then it went to, like, every two
14  months, I think, just before he died.
15          But he was -- he would be in one visit and
16  the doctor would -- he was very abbreviated in his
17  notes but he would write stable. Then the next
18  month he would come in and extremely high stressors.
19  Medication had to be adjusted again. He was having
20  not only family problems; he was having financial
21  problems. His insomnia was also an issue based on
22  his unstable day-to-day existence.
23      Q.   Is insomnia something that Lincoln Benefit
24  didn't know about at the time of the applications?
25      A.   No, we did not.

57

1       Q.   If you received medical records about
2   insomnia and about Paul being treated with Ambien,
3   that would come as a surprise to you?
4       A.   Yes.
5       Q.   Dr. Dorfman called the anxiety mild to
6   moderate, and he said that the level of prescription
7   medications that Paul was taking was not out of his
8   standard range.
9           Would that change your testimony at all?
10      A.   No.
11      Q.   With respect to a number of these other
12  numbers, it seems to me like a similar mixture of
13  alcohol and drugs. Do I understand that's your
14  consistent concern, the mixture of alcohol and
15  drugs?
16      A.   That's the primary concern.
17      Q.   I don't imagine you love the head
18  injuries.
19      A.   Well, there are a number of concerns. One
20  is he had -- since 2009 on, he was having issues.
21  And he sought treatment from multiple doctors. At
22  the same time that he was seeing these doctors, he
23  was filling out applications. And although he
24  provided the doctors -- some doctors with his
25  medical history, he never reflected any of that on

58

1   our application.
2           So the fact that these were long-term
3   issues that had not yet been stabilized --
4   particularly the anxiety, panic disorder, insomnia,
5   the fact that he was on multiple medications to
6   attempt to control it and that still was not
7   controlling it, that's one issue.
8           The other issue is that he was going to
9   another doctor unbeknownst to the first one and
10  receiving additional medication.
11          He had head injuries. At one point he
12  says that he had eight head injuries. I think we
13  see four in the records. At least we can trace four
14  in the records that we received upon investigation
15  where he was concerned about the residuals. We
16  never received that.
17          There's one note in one file in the
18  medical records that we received during underwriting
19  where there was an old history of loss of
20  consciousness but there was nothing that indicated
21  that he was having any continuing problems or there
22  was any after effect.
23          So we were not aware of any of this
24  information. I think probably the most important
25  history that would have led us to not issue nor

59

1   reinstate these policies was the combination of the
2   anxiety history, the nervous disorder history, the
3   level of medication that he was taking, the fact
4   that he was abusing these prescription drugs in
5   addition to using alcohol at the same time; and
6   there had been three recorded incidents of where
7   these things led to an emergency room or
8   hospitalization.
9           These are significant facts. We would not
10  have issued these. No one would have issued these.
11      Q.   You note at No. 9 Godlewski frequently
12  traveled outside the United States. My
13  understanding from your earlier testimony is that
14  that is no longer a concern that you have.
15      A.   That is correct.
16      Q.   Based on the countries you are aware of?
17      A.   Assuming that we know all at this point.
18      Q.   I assume that if tomorrow we discovered
19  that he's been spending a lot of time in South
20  Sudan, that could change. But as of right now.
21          In 10, you say Godlewski was an avid SCUBA
22  diver. What makes you say that he was an avid SCUBA
23  diver?
24      A.   I think at the time we received, during
25  the early part of the investigation, it appeared

60

1 that he was a SCUBA diver.
2     Q.   Does it appear that way now?
3     A.   We don't have sufficient information to
4 say that. There are indicators, but we don't have
5 sufficient information. We don't have, for example,
6 a copy of a PADI book, a diver's book, guide.
7         But maybe I should say if he was a SCUBA
8 diver, this would have been a severe concern because
9 anybody who has that level of medication that they
10 are taking, the benzodiazepines, in addition to his
11 history of using these substances, we would not have
12 issued that.
13     Q.   Sure. Makes sense. It sounds like right
14 now you're saying -- again, this is all subject. We
15 are not done with fact discovery. You are just not
16 aware that he was a SCUBA diver? You don't have
17 evidence of that?
18     A.   We don't have evidence. There is some
19 indication that he was, but we have not found that
20 as far as I know.
21         MR. GOSSELIN:  We are waiting on the
22 subpoena from the Diver's Action Network. You
23 guys got a copy of that. The lawyer called me
24 yesterday and he was going to have those
25 records for us within two weeks.

61

1         MR. LARKIN:  Should we take a break?
2         MR. GOSSELIN:  Why don't we? It's
3 been over an hour.
4         (Whereupon, a brief recess was
5 taken.)
6         MR. LARKIN:  Back on the record.
7         THE WITNESS:  I just wanted to make
8 an addendum. I thought it might be helpful
9 because you were asking to quantify what's in
10 the records, which I don't have in front of me,
11 to point out all those indicators that are in
12 the record that reflect the evaluation of the
13 doctor and all the input that had been placed
14 in the record.
15         But as an underwriter, when we are
16 evaluating alcohol use, not everybody is
17 diagnosed with alcohol abuse, dependency,
18 alcoholism, et cetera. This is on your 5551
19 page.
20         When we are defining alcohol abuse,
21 what we are looking for in the record, as I
22 said, we are not diagnosticians but we've got
23 to go with the facts presented.
24         One of the first things that you have
25 listed out of the four types of alcohol

62

1 disorders, there's alcohol use, alcohol abuse,
2 alcohol dependence, or alcoholism and then
3 binge drinking.
4         So for the very first one, alcohol
5 use disorders include abuse and dependence and
6 they are present when the consumption of
7 alcohol and resulting intoxication interferes
8 with an individual's ability to maintain
9 control over his or her actions, especially
10 those that promote personal health and safety.
11         If you read this entire section, the
12 types of things that we are looking for is to
13 find out whether or not we have a person who
14 has an alcohol problem based on the fact that
15 they were hospitalized or there was a medical
16 intervention because of it.
17         Now, is that treatment? I can't
18 really say. We are not talking about
19 Alcoholics Anonymous or he's been put on
20 anti-abuse or what have you. But we do know
21 that he ended up in the hospital because of use
22 of prescription drugs and alcohol.
23         So as I said, when you look at the
24 entire body of records that we received, all
25 the indicators show that this is the type of

63

1 profile that we had.
2 BY MR. LARKIN:
3     Q.   I guess what I'm struggling with is you've
4 said a couple of times now that you're not
5 diagnosticians. And then it sounds to me like
6 you're saying but we're going to evaluate the facts
7 and make a decision whether he suffers from one of a
8 number of different medical disorders, which sounds
9 to me a lot like being a diagnostician.
10     A.   No. It's using a reference in our manual
11 that best addresses the facts that we have been
12 presented.
13     Q.   So in the case of a person who had no
14 diagnosis of alcoholism, alcohol dependence, binge
15 drinking, or problem drinking, you would be
16 comfortable making the decision, although no doctor
17 has said that he has one of those problems, we're
18 going to decide that he does and put him in one of
19 the spots in the --
20     A.   No. What we're going to say is if the
21 facts show that he was drinking, there was an effect
22 from that drinking -- they smelled alcohol on him, I
23 think, when he was admitted to the hospital. I'm
24 not sure if that was that record. I'm pretty sure
25 it was that record. It might have been the Turks

64

1    and Caicos one.
2           But he had been hospitalized a number of
3    times and alcohol was part of the issue.
4           So as I said, a lot of the information
5    that we have are based on statistics of known
6    histories. But not everybody fits exactly into
7    every category with their profiles. And sometimes
8    you don't have a diagnosis.
9           But facts are facts. If they are telling
10   you that he is here, all of the conversations about
11   alcohol use, overuse, and its effect are in his
12   record, then we have to decide, well, where are we
13   going to put him in order to determine what his
14   mortality is.
15     Q.   And you're saying that you would put him
16   into the alcohol abuse category?
17     A.   Right.
18     Q.   I guess that really kind of answers
19   Question No. 13. You put down: Godlewski suffered
20   from alcoholism. It sounds like that's why you
21   believe he suffered from alcoholism.
22     A.   Right.
23     Q.   So there's not a diagnosis that says he
24   suffered from alcoholism, but you have reviewed the
25   incidents and there are three, maybe four times he

65

1    was sent to the hospital for alcohol-related
2    injuries.
3      A.   Alcohol was a component of each one of
4    these, yes.
5      Q.   And four incidents to you creates
6    alcoholism?
7      A.   I didn't say it's alcoholism. But I'm
8    going to use that as a reference to try to assess
9    the risk that he presents.
10     Q.   Well, you did say it was alcoholism. Not
11   you personally, but Lincoln Benefit did. Because at
12   No. 13, the answer to my question, give me every
13   material misstatement or omission, it says Godlewski
14   suffered from alcoholism.
15          My question now is a little different from
16   what we were talking about before. I'm asking four
17   incidents constitutes alcoholism, it sounds like?
18     A.   I'm not sure how you got there. But
19   alcoholism can be diagnosed in one incident. I am
20   just saying that when I'm looking at records that
21   show a consistent usage of alcohol as being a part
22   of his health issue, then we know that we have an
23   alcohol component.
24     Q.   Okay. And that's alcoholism? Because
25   you're very carefully not using the word

66

1    "alcoholism." You have said alcohol component,
2    alcohol problem, drinking problem.
3      A.   Well, maybe to make it clear, whether we
4    use alcohol abuse, alcoholism, the facts are the
5    same. He has an alcohol problem. Which one of
6    these problems it is? It may be abuse. It may be
7    alcoholism.
8           I think at one point there is a mention in
9    there, but I think it came from a family member.
10   Actually his father and maybe one of his
11   girlfriends. So there is an indicator that there is
12   a problem and it has been observed.
13     Q.   You keep saying a problem, but it says
14   right here Godlewski suffered from alcoholism. What
15   is it that specifically makes it alcoholism in this
16   case?
17     A.   The fact that alcohol was a component in
18   his health disorders that put him in the hospital.
19     Q.   And then the next one is Godlewski
20   suffered from an opioid addiction. What makes it an
21   opioid addiction?
22     A.   These are words that -- this was a
23   diagnosis that came in a record from Dr. Linet.
24     Q.   There's no one else who has indicated that
25   Godlewski suffers from an opioid addiction.

67

1    Dr. Linet was pretty confident that he heard that
2    from Paul Godlewski. I want to make real sure that
3    I understand that is the extent for the basis of
4    that claim. It's Dr. Linet?
5      A.   He's a licensed professional and those are
6    his official records.
7      Q.   Absolutely. I understand. I just want to
8    make sure there's not something else out there that
9    I missed.
10     A.   (Witness shakes head.)
11     Q.   You're shaking your head no.
12     A.   When you say there's not something else
13   you missed, by way of what records we have? Is that
14   what you're saying?
15     Q.   Yes.
16     A.   You have all the records that we have.
17     Q.   We thought that yesterday and then another
18   900 pages showed up. So I'm a little leery of
19   saying that I agree with you. That's why I'm
20   pressing you on this issue and will on a few others.
21     A.   Okay.
22     Q.   The next one, I asked: Tell me the effect
23   that each one of the misrepresentations would have
24   had individually. And the response is: Each
25   misrepresentation or omission must be analyzed

68

1  collectively with the entirety of the truthful
2  information concerning Godlewski.
3          You have identified a number of individual
4  problems, however, that just all by themselves would
5  have disqualified Godlewski from insurance. So why
6  are we analyzing them collectively?
7      A.  Because it's the collective co-morbidities
8  that make a difference. So you're asking -- before
9  you said you had anxiety. Are you uninsurable? No,
10  you're not. But depending on the severity of your
11  anxiety or the multitude of medications that have to
12  be dispensed in order to control it, if it can be
13  controlled, that makes a difference.
14          Now, in relation to anxiety or any other
15  nervous disorder, he had a couple of them. If they
16  are not controlled, that's a big issue. If, in
17  addition to those mental disorders, now you're
18  adding substance abuse, that is a huge issue because
19  the mortality of that combination is excessive.
20  It's uninsurable.
21      Q.  What are the mental disorders that he
22  suffered from?
23      A.  So he had panic disorder. He had
24  extremely high stress. He had depression. He had
25  high anxiety, uncontrolled high anxiety. He had a

69

1  compulsive disorder.
2      Q.  Who diagnosed him with the compulsive
3  disorder?
4      A.  There are a multitude of records here. I
5  was really hoping that you would have the records so
6  we could just open them up and point to it.
7      Q.  I will tell you Dr. Linet told us that he
8  had panic disorder and Dr. Dorfman told us that he
9  suffered from insomnia and --
10      A.  I'm sorry. In addition there was
11  insomnia, yes.
12      Q.  Which you said you didn't have any records
13  of beforehand.
14      A.  Right.
15      Q.  And Dr. Dorfman also said that he suffered
16  from mild to moderate anxiety. Dr. Dorfman called
17  it severe panic disorder.
18          I have not heard from a medical
19  professional that he suffered from a compulsive
20  disorder. I have not heard from a medical
21  professional that he suffered from a specific stress
22  disorder. And your testimony is there's a record
23  somewhere separate from the deposition testimony
24  that we received that indicates that he does.
25      A.  You know, I hate to do this from memory,

70

1  but I believe that the depression is listed in the
2  hospital that begins with an H. I will back up.
3          There is a mention of depression. There
4  is a mention at least twice of a compulsive
5  disorder. I think once it says it's OCD and another
6  doctor -- I think it was Linet -- says something
7  about he makes a lot of lists. He's compulsive in
8  that way.
9          But there's depression listed. It was
10  during a hospitalization. It's listed multiple
11  times.
12      Q.  On Page 7, I asked what the value of the
13  premiums that had been accepted were. And the
14  answer was: We don't know yet but we will find out.
15          Do you know what that value is yet?
16      A.  Is that the -- well, I can tell you that
17  the value of the premiums represented the amount of
18  insurance that he had to -- or the premium that he
19  had to pay based on his categorization. Most of his
20  policies were issued at standard nontobacco rates.
21      Q.  My question though is: Do you know how
22  much he paid in premiums all together?
23      A.  Oh, I cannot tell you. That's what you
24  meant by total value of premiums? The actual dollar
25  amount?

71

1      Q.  The actual dollar amount.
2          MR. GOSSELIN:  That's something that
3  can be gotten easily.
4          THE WITNESS:  Yeah. That can be
5  easily found out.
6          MR. LARKIN:  That's what I thought.
7  I was surprised it wasn't there, but we will
8  get to it. It's not the biggest thing.
9  BY MR. LARKIN:
10      Q.  If you could go to Tab A, there's a lot of
11  repetition in here. So I'm hoping we can move
12  through these a little faster as we go through them.
13          If you could go to Page 8 in Tab A.
14      A.  (Witness complies with request.)
15      Q.  I have asked a couple of questions about
16  Godlewski's suicide. And the answer to all of them
17  has really been you have to direct this to our
18  expert.
19          I understand that you're not going to be
20  able to give me medical information about the
21  effects that drugs would have on the body or
22  anything else. But my question is can you tell me
23  how he committed suicide.
24      A.  Can I tell you how he committed suicide?
25      Q.  Yes.

72

1    A.   I wasn't present.
2    Q.   Okay.
3    A.   I can tell you what the historic record
4    shows of multiple incidents that seem to be
5    reflective or exact in profile to how he may have
6    died from at least the indications that -- some of
7    the indications that we see.
8         And that is that he combined prescription
9    drugs with alcohol; and then usually he was in a
10   place where it probably was not the best place to
11   be. One time he was in a hot tub. One time he was
12   snorkeling.
13   Q.   So it sounds to me like you're saying it
14   happened before and that's what we think happened
15   this time? And I will kind of expand a little bit
16   just to be clear.
17        You've told me what you think or at least
18   I can infer what you think is the reason he would
19   commit suicide. So I understand that. I certainly
20   see that he has a history of contemplating suicide
21   in the recent days or weeks before he died based on
22   the web searches he was conducting.
23        But there's a medical professional who has
24   testified he died of a heart attack. So my question
25   is: I can see why he might have committed suicide,

73

1    but what is it that makes you say that he did commit
2    suicide?
3         MR. GOSSELIN:   I object. You can
4    answer the question. But this is a question
5    that really only an expert -- we would have to
6    rely or likely have to rely on an expert for
7    this.
8         But she can answer the question. I
9    think she just did. But if there's more you
10   want, that's fine.
11   BY MR. LARKIN:
12   Q.   If there's a gun found next to the body
13   and there's a hole in the man's head and a note that
14   says goodbye, cruel world, I know the facts are
15   going to say we think we know how he committed
16   suicide.
17        Do you have a contention that he took
18   medication in this case to cause his own death?
19   A.   All I know is that he was in a habit of
20   taking excessive amounts of prescription drugs.
21   It's in the record every time he took more than he
22   was supposed to take. He was warned over and over
23   again not to take too many and not to mix it with
24   alcohol. And in the record, it says that he
25   intentionally took both together.

74

1    Q.   And your contention is that occurred --
2    A.   My contention is that is a dangerous
3    situation.
4    Q.   And that occurred before his death,
5    immediately prior to his death?
6    A.   I am just talking about the incidents that
7    we have records of. The primary reason we would not
8    have issued him is because he could have died from
9    these incidents.
10   Q.   Is it your contention that he did die from
11   the incidents?
12   A.   No. What I'm saying is that in the
13   record, there is a history of this happening.
14   Q.   See, because there are two claims. One is
15   material misrepresentation and the other is suicide.
16   I have to win on both in order to win the case.
17        So I'm trying to figure out separate from
18   material misrepresentation what is it that makes you
19   think that he actually committed suicide as opposed
20   to he was a suicide risk.
21        It sounds like what you're telling me is
22   he had means, motive, and opportunity. But that's
23   not the same as saying here is how I know he
24   actually committed suicide.
25   A.   I am just saying that there are three

75

1    incidents, and I have never seen this before where
2    the same situation has happened and the person
3    nearly died. Three separate incidents in a very
4    short period of time. Each one of them were based
5    on the same combination of factors.
6    Q.   Moving to the next tab which is B, if you
7    could go to Page 2, there was a change in premium on
8    a number of the policies from standard nonsmoker,
9    Table B, to just standard nonsmoker. Why the
10   change?
11   A.   So years ago -- I'm sorry. Unless you
12   have the name of the physician -- I don't have it by
13   memory -- one of his physicians had seen spots on
14   his back and his neck. It turned out he had
15   dysplastic nevus. He had some keratosis. He had
16   what we might call skin tags. But they were
17   growths, benign tumors. And he had them removed.
18        But he had a number of them removed. I
19   think he had six or seven of them. But because of
20   the recurrence and the pathology reports, our rating
21   manual indicated that we needed to put a table
22   rating on it.
23        So when I was talking about debits before,
24   debits translate into table ratings, categories. So
25   we rated him at 50 percent increase in mortality

76

1　because of those nevus -- because of that nevus
2　history.
3　　　　　Apparently he no longer had any further
4　concerns and we removed the table rating. So we
5　gave him a standard nontobacco rating.
6　　　　　MR. HAYDEN:  Did you say you removed
7　　　the table rating?
8　　　　　THE WITNESS:  Yes.
9　　　　　MR. HAYDEN:  Thank you.
10　BY MR. LARKIN:
11　　Q.　That's the same as Table 2?  Table B is
12　Table 2?
13　　A.　Yes.
14　　Q.　Go then to Tab C, Page 2.  This is
15　essentially the same question.  The table rating,
16　I'm assuming, for all of the policies was removed
17　for the same reason?
18　　A.　Yeah.  This started back in 2006 with one
19　of the very early policies.
20　　Q.　How long do you have to go with no
21　concerns before the table rating can be removed?
22　　A.　Depends on the condition.
23　　Q.　For this condition?
24　　A.　So since he no longer had any of these and
25　also -- well, because he no longer had any of these,

77

1　we felt that we were comfortable giving him a
2　standard rating.
3　　Q.　So there's no waiting period?
4　　A.　Yeah.  There's always a waiting period.
5　　Q.　How long was the waiting period?
6　　A.　So I think the last one he may have had
7　removed was in 2009.  It was either 2007 or 2009.
8　After that, everything else that he had removed was
9　of no importance.
10　　　　　Because there was no recurrence, he no
11　longer needed the rating for that condition because
12　it was no longer present.  It had been a while ago.
13　There was no recurrence.
14　　　　　We do that with any tumor, whether it's
15　breast cancer, prostate cancer, whatever.  When was
16　it removed?  Has there been a recurrence?  How long
17　has it been?  If the time from incident to present
18　evaluation time lengthens, then that rating will
19　either go down to nothing or it could just simply be
20　removed.
21　　Q.　From my reading, it looked like the
22　dysplastic nevi would cause you to have the Table B
23　but the basal cell carcinomas would not; is that
24　correct?
25　　A.　Right.

78

1　　Q.　The basal cell carcinomas that were being
2　removed, those are what you were referring to as not
3　having any importance?
4　　A.　Well, they do have in combination with the
5　presentation of nevus, yes.  Whenever you have
6　cellular activity, there is a concern.
7　　　　　So between the two of them -- I think they
8　were both from 2005.  If we had the record, I would
9　be able to pinpoint the date.  Because there had
10　never been a recurrence, we were comfortable with
11　going standard.  We do that with all of our
12　customers.
13　　Q.　If you could look at Page 9, my question
14　is: If you contend Godlewski suffered from an
15　anxiety disorder, set forth the risk classification
16　of that disorder as the term is used by the Swiss Re
17　manual.
18　　　　　And the answer was --
19　　A.　Sorry.  What page?
20　　Q.　Page 9.  The answer was: You should talk
21　to Swiss Re about that.
22　　A.　Are you talking about under 15, the last
23　line?
24　　Q.　Yes.
25　　A.　Tell me again please.

79

1　　Q.　My question to you is:  What is the risk
2　classification that you would give to Paul's
3　anxiety?
4　　A.　Oh.  So that's in the documents that we
5　gave you, that we provided that we were just looking
6　at a minute ago.
7　　Q.　That sets forth all of the various risk
8　classifications.  My question is:  What is your
9　contention -- was it in this case?  What is the risk
10　classification in this case?
11　　A.　So in the doctor's reports, based on the
12　doctor's reports, based on the inability of the
13　doctor to control the anxiety, in addition to the
14　combination of the alcohol being present and the
15　abuse of the medication itself, that would have been
16　not a rating.  It would have been a decline.  We
17　would not have issued him a policy.
18　　Q.　When I use the term "rating" -- and that's
19　perhaps an error -- I understand it to be mild,
20　moderate, or severe.  And based on within those
21　categories, it would then be an additional fee that
22　you pay, monthly premium, or a decline or a
23　postpone.
24　　　　　So my question is:  It sounds like you're
25　saying it would be severe anxiety?

**80**

1  A.  When it's uncontrolled, sure, yes.
2  Q.  What makes something uncontrolled?
3  A.  So a number of things. The fact that the
4  medication that's been prescribed is not resolving
5  the issue. Additional medication is not resolving
6  the issue. An increase in medication is not
7  resolving the issue. The doctor reflects that the
8  stress continues, that the patient needs to be moved
9  to some additional medication. That's not
10  controlled.
11  Q.  Dr. Dorfman testified that it's rare that
12  you see the issues that his patients come in for
13  being resolved. You don't go in, get fixed, and
14  then move on with your life.
15  So what would you want to see from someone
16  who had anxiety disorder in order to determine that
17  the disorder was mild?
18  A.  Well, actually, our manual provides -- if
19  you look at 05570 -- actually, I mean, we can read
20  the entire document about what anxiety is and
21  description, et cetera, since you asked about mild,
22  moderate, or severe.
23  So this particular page, 5571, explains
24  what we would categorize in order for rating
25  purposes mild, moderate, or severe.

**81**

1  Q.  Has Paul been referred for specialist
2  psychoanalysis, counseling, or psychiatric
3  treatment?
4  A.  Dorfman, yeah. And also when he was
5  discharged, he was referred -- it said that there
6  was also supposed to be a psych evaluation in 2012.
7  Q.  What's the difference between a
8  recommendation and a referral to you?
9  A.  Same difference.
10  Q.  You are aware that medically they are not
11  the same thing, correct?
12  A.  Well, it's a verb. I'm referring you or
13  I'm recommending that you go there.
14  Q.  So you understand them to mean the same
15  things?
16  A.  For our purposes, it means the same thing.
17  In other words, the doctor has indicated that there
18  needs to be a second step.
19  Q.  Are you aware if Paul ever took time off
20  work as a result of his anxiety?
21  A.  You know, in the record, it indicates that
22  he has been having problems with -- at work. I
23  wouldn't be able to -- I don't memorize the
24  terminology that he used.
25  But when he went into Dr. Dorfman, usually

**82**

1  the very first part of it would be subjective
2  analysis where he is telling Dr. Dorfman how he
3  feels, what's happening in his life. And it
4  appeared that the stresses that he was undergoing
5  were affecting his work.
6  Q.  So you think that he took time off work?
7  A.  Well, I can't tell you whether or not he
8  took time off work. I mean, his occupation -- I'm
9  not sure if he had a 9:00 to 5:00.
10  Q.  What would you call a disabling attack?
11  A.  Well, a disabling attack would be a number
12  of things. One is that it could be not working, not
13  being part of society. It can be hospitalization.
14  It can be inability to function, whether it's
15  socially, whether it's familial, whether it's
16  occupational.
17  Q.  Are you aware if Paul was ever sent to
18  inpatient counseling?
19  A.  Well, he was hospitalized. That was
20  treatment.
21  Q.  Under severe -- I think you understand
22  that I'm asking about these specific definitions of
23  mild, moderate, and severe -- it indicates a severe
24  condition consists of recurring or deeper anxiety
25  for which inpatient care may have been necessary.

**83**

1  Are you saying that the inpatient care
2  that he received was specifically for the recurring
3  or deeper anxiety?
4  A.  So it's my understanding that the reason
5  that he self-medicated was because of a lot of the
6  stress that he was under and he wanted to relax. So
7  he took the alcohol. He increased his dosage of the
8  Lorazepam. Because of that, he ended up in the
9  hospital.
10  So he was being treated because the
11  underlying condition that started all of this was
12  the stress that he was undergoing, which is part of
13  that whole anxiety, panic, et cetera. But it was a
14  nervous disorder that caused it, and that's how he
15  ended up in the hospital.
16  And while he was in the hospital, he,
17  obviously, was disabled because he couldn't do
18  anything else but be in the hospital.
19  Q.  Okay. If you go to 17 on the next page,
20  the final sentence is: Lincoln Benefit responds
21  that Godlewski's mental functional capacity may have
22  been impaired with respect to the following
23  nonexhaustive functions.
24  A.  I'm sorry. I need to catch up with you.
25  MR. LARKIN:  And we can go off

1    confidential now.
2              (Whereupon, end of confidential
3    portion of transcript.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25